**STATE OF HAWAIʻI**, Plaintiff–Appellee, v. **FRED SILVA, III**, Defendant–Appellant

NO. 16313

(CR. NO. 91–0217)

DECEMBER 14, 1993

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, AND RAMIL, JJ.

420

## OPINION OF THE COURT BY MOON, C.J.

Defendant–appellant Fred Silva III was convicted of Assault in the First Degree in violation of Hawai'i Revised Statutes (HRS) § 707–710.[1] Silva appeals his conviction claiming that there was insufficient evidence adduced at trial to convict him of the offense charged. Silva also claims that he was rendered ineffective assistance of counsel at trial. We affirm.

Based on the record as it now stands, Silva has failed to demonstrate that he was rendered ineffective assistance of counsel; however, we conclude that: (1) Silva has alleged facts that, if proven, would entitle him to relief, and (2) Silva's claim is not patently frivolous and without trace of support in the record. Therefore, although we affirm Silva's conviction, we do so without prejudice to the filing of a Hawai'i Rules of Penal Procedure (HRPP) Rule 40 petition on the ineffective assistance of counsel claim.

---

[1] HRS § 707–710 provides in relevant part: "A person commits the offense of assault in the first degree if he intentionally or knowingly causes serious bodily injury to another person." "Serious bodily injury" is defined in HRS § 707–700 (Supp. 1992) as "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."

## I. BACKGROUND

On the evening of January 14, 1991, a fight involving Silva occurred at the home of Leila Kaehu (Leila). During the fight, Audrey Simpson, Leila's boyfriend, was injured. On January 18, 1991, a preliminary hearing was held in the District Court of the First Circuit to determine whether there was probable cause to commit Silva to the circuit court for jury trial on the charge of assault in the first degree, a class B felony.

At the preliminary hearing, Gina Miranda, a witness to the alleged assault, testified that she saw Silva "chop" Simpson on the back of the neck with an open hand while Simpson was struggling with another man, Leila's son, Lincoln Kaehu (Lincoln). Miranda further testified that Silva had continued to punch and kick Simpson while Simpson was prone on the floor. Under cross examination, Miranda admitted that her eyesight was "bad."

Simpson testified that he was attempting to keep Lincoln from striking Lincoln's girlfriend, Lokelani Farias, when Silva hit him on the back and then beat him into unconsciousness. Simpson described his injuries as including a fractured right orbit (the bone surrounding the eye socket), a concussion, facial lacerations, lost teeth, temporary loss of vision in his right eye, and continued blurred vision. Simpson further testified that he had consumed approximately four mixed drinks in approximately three hours while at the Kaehu home on the day of the incident, and that he had also smoked some marijuana earlier in the day. The district court concluded that there was probable cause and committed Silva's case to the circuit court for jury trial.

Silva was initially represented by the State Public Defender's (PD) Office. However, in May 1991, the PD

moved to withdraw as Silva's counsel, explaining that Silva no longer wanted to be represented by the PD. On June 10, 1991, Frank Fernandez was appointed counsel for Silva by the circuit court.

At a trial–scheduling conference on November 15, 1991, Fernandez indicated that he was having difficulty locating a defense witness, and that he would therefore have to file a motion to continue the trial. On December 5, Fernandez filed a motion to continue pre–trial motion deadline. In his supporting affidavit Fernandez stated that he "need[ed] more time to locate the witness for the defendant." The motion came on for hearing on December 10, but Fernandez, without explanation, failed to appear, and the court denied the motion without prejudice. On December 16, the eve of trial, during a conference with the prosecuting attorney and the court, Fernandez again indicated that he needed more time to look for a defense witness, and that he intended to file another motion to continue the trial for one week. The court stated that the trial would not be delayed any longer.

In his opening statement at trial, which commenced on December 17, 1991, Fernandez told the jury that the defense would show that Simpson had been beating Lincoln when Silva came to Lincoln's aid, and that Silva had also defended himself from a subsequent attack by Simpson. Plaintiff–appellee State of Hawai'i (the prosecution) called three witnesses: (1) Miranda; (2) Kale Kaehu (Kale), Lincoln's brother and Miranda's boyfriend; and (3) Simpson.

Miranda testified that she, Kale, their two children, Lincoln (Kale's brother), and Simpson (Lincoln's friend), all lived at Leila's house. On the afternoon and into the early evening of January 14, 1991, all of the aforementioned persons, along with several other friends and

Farias (Lincoln's girlfriend), had been socializing at a nearby beach and later at Leila's home. All of the men had been drinking.

Miranda explained that she, her two children, Kale, and Farias had earlier gone to the store to buy dinner at approximately 7:00 p.m. to be consumed at Leila's home. She stated that Lincoln and Farias began arguing heatedly and that Lincoln subsequently turned belligerent. She testified that Lincoln "slammed" Farias up against the refrigerator, and that Lincoln also pushed her (Miranda) and struck her two–year–old son in the face.

Miranda related that she then called for Simpson, who was lying down in one of the bedrooms. Simpson came into the room where the disturbance was taking place and attempted to calm Lincoln down. Miranda testified that Simpson grabbed Lincoln in a sort of "bearhug" in order to get him under control. She stated that the two men fell over onto a couch, at which time Kale jumped in to separate them and get them off the couch because he feared that his infant daughter was on the couch underneath the struggling men.

Miranda further testified that after Kale separated the two men, Simpson again "bearhugged" Lincoln, who was still acting violently. At this point, Silva, who had been lying on a sofa or on the floor in an adjoining room, came to where the two were struggling and "chopped" Simpson on the back of the neck. Silva then grabbed Simpson by his long ponytail, and the two men started falling to the ground with Silva punching. After Silva regained his footing, he proceeded to kick a prone and defenseless Simpson. Miranda stated that Simpson never struck at Silva and that Silva was silent throughout the episode. Eventually, both the police and an ambulance

were called, and Simpson and Lincoln were taken to the hospital for treatment.

Kale testified that he had been outside in the garage with friends when he heard the argument start up between Lincoln and Farias. He went into the house and tried to calm Lincoln down; however, Lincoln began threatening Kale, asking him to fight. They struggled briefly; Lincoln then broke free and "started chasing the girls around the table." At that point, Simpson emerged from the bedroom and also tried to calm Lincoln down, eventually grabbing him around the arms. Kale related that he "threw them off" the couch for fear of his daughter being crushed. When he realized that she was not on the couch, he went back outside in search of her. However, before he left the room, he saw Silva walk up to the struggling pair and strike Simpson on the back of the neck. He saw nothing subsequent to that one blow because he had gone outside immediately thereafter.

Simpson testified that he had been visiting his girlfriend, Leila, and her family that day. He admitted to having consumed approximately four mixed drinks between 4:00 and 6:30 p.m. He then went to lie down and rest in Leila's bedroom, but was soon roused by the sound of loud arguing voices. Simpson stated that when he came out of the bedroom, he saw Lincoln "arguing, fighting, going to hit [Miranda], one of the girls that was there, and I grabbed him, grabbed at him and tried to hold him." He testified that he was also talking to Lincoln, trying to get him to calm down. He admitted that he "may have swung at [Lincoln] but [knew] that [he] didn't strike him."

Simpson also testified that while he was struggling with Lincoln, he felt something hit him across the back. He stated that he "halfway turned" and saw Silva, who then grabbed him by the hair and pulled him to the

ground. Silva then kicked him in the face and "just started kicking and punching me, had me down on the floor." He stated that he could not remember hitting Silva. Simpson testified that he lost consciousness; the next thing he remembered was being placed into an ambulance.

After Simpson's testimony, the prosecution and Silva stipulated to the following evidence, which was read into the record:

> That the next witness for the State of Hawai'i would be Dr. Robert Behrendt, M.D., that Dr. Behrendt [would] testify that he is a doctor licensed to practice medicine in the State of Hawai'i and was so at all relevant times in this case, that Dr. Behrendt is qualified as an expert in the field of emergency medicine in the State of Hawai'i, that Dr. Behrendt is further qualified to testify and render opinions regarding the examination, diagnosis and treatment of blunt trauma injuries, that Dr. Behrendt would testify that he examined and treated Audrey Simpson at the Kaiser Permanente Medical Center's emergency room on January 14th 1991, to and including January 15th, 1991, that pursuant to his examination of Audrey Simpson, Dr. Behrendt would testify that he observed a laceration near the right eye, contusions to the right side of Mr. Simpson's face and a fractured right orbital, that pursuant to his diagnosis of these injuries, Dr. Behrendt would tesify that Audrey Simpson suffered from a concussion and a fractured right orbital, that Dr. Behrendt would testify that the orbital is the bone surrounding the eye socket, that Dr. Behrendt would testify that he sutured the laceration near the right eye of Audrey Simpson, that all of these

injuries were, to a reasonable medical certainty, consistent with blunt trauma injuries from hand and foot blows, that Dr. Behrendt would testify that the injuries to Audrey Simpson created a protracted loss or impairment of function of Mr. Simpson's right eye, a bodily member or organ[.]

Following the prosecution's case, the defense moved for a judgment of acquittal; the court denied the motion. Silva then took the stand and testified that after drinking with the rest of the family that afternoon, he lay down on the living room floor to rest because he had to be at work early the next day. Silva explained that he laid on the floor because of a chronic back condition and fell asleep. He was awakened by the sound of loud arguing and saw Lincoln and Simpson begin to fight, "throwing blows back and forth." According to Silva, Simpson did not just grab Lincoln, "[t]hey were both punching each other back and forth . . . and then [Simpson], he went [sic] land one, went [sic] hit the boy. The boy went [sic] fall down on the couch."

Silva also testified that, after Lincoln fell onto the couch, Simpson continued to punch him in the face and the head. Silva stated that he then stood up and started walking toward the fray, while at the same time saying to Simpson, "enough already." Silva related that he then grabbed Simpson's ponytail and pulled him away from Lincoln, at which time Simpson turned around and threw several punches at Silva. He tried to subdue Simpson, and, according to Silva, as they were struggling with each other, they must have tripped and fallen over a living room table.

Silva further testified that he fell on top of Simpson, his elbow striking Simpson in the face and knocking Simpson unconscious. He told Lincoln to call an ambu-

lance. Silva confirmed that he and Lincoln were good friends and that Leila had invited him to live with the family. He stated that Simpson had seemed "kind of drunk." When challenged on cross–examination with Miranda and Kale's previous testimony, Silva stated "the testimony wasn't very truthful [and] I'm just sorry that Lincoln couldn't be here."

Following Silva's testimony, Fernandez informed the court that he had "one or two more witnesses" and requested "a short recess so I can go out and look for them." He apparently did not find them because the defense subsequently rested without calling any other witnesses. The defense again moved for a judgment of acquittal, and the court again denied the motion.

During its deliberations, the jury asked the court whether the defense had "the option of calling in witnesses" and specifically named Lincoln and several others. The court informed the jury that Silva "[had] no duty or obligation to call any witnesses or produce any evidence." The jury subsequently returned a guilty verdict on December 18, 1991.

On January 8, 1992, Fernandez filed a motion for new trial on Silva's behalf, claiming that an eyewitness, Lincoln Kaehu, previously "not available during trial, is now available to testify." In opposition to the motion, the prosecution argued that: (1) pursuant to HRPP Rule 33,[2] the court lacked jurisdiction to consider the motion because it had been brought more than ten days after the verdict; and (2) because Lincoln was available but the

---

[2] HRPP Rule 33 provides in relevant part: "A motion for new trial shall be made within 10 days after verdict or finding of guilty or within such further time as the court may fix during the 10–day period."

defense failed to subpoena him, his current "availability" did not constitute the requisite "new evidence" under Rule 33.

At the hearing on the motion, the following colloquy occurred:

> FERNANDEZ: [T]he witness to the defense, we'd argue, was unavailable. He would not make a statement over the phone; he would not take a deposition; he would always evade me. I was never able to speak directly to him over the phone, although, I never knew where he was staying.
>
> THE COURT: Well, you are able to subpoena him.
>
> FERNANDEZ: The sheriffs weren't able to subpoena him, Your Honor. They tried, at least.
>
> THE COURT: Well, you said you talked to him.
>
> FERNANDEZ: Well, not directly. I talked to his mom, and his mom, you know, indicated that he was staying there, but he never gave me a statement as to what happened, over the phone.
>
> [PROSECUTOR]: For the record, if Your Honor will reflect back, I believe in chambers he — no, strike that.
>
> Maybe Mr. Fernandez will confirm this. Prior to trial, there was a motion to continue the trial based on the fact that defense had not been able to secure this particular witness.
>
> This hearing was heard before Judge Spencer, and, basically, the motion was denied.
>
> At that time Mr. Fernandez had indicated that he had had an investigator who had actually

made contact with this particular witness. And at that time that investigator did not serve the witness with a subpoena; although he had ample opportunity to do so, and they knew what the witness was intending to use to testify at trial.

Your Honor, with respect to this particular witness, he was not unavailable inasmuch as they had the opportunity to subpoena him, and they did not.

THE COURT: All right. Mr. Fernandez, anything else?

FERNANDEZ: Yes, Your Honor. The investigator did talk to him over the phone, but did not serve him with a subpoena.

The court denied the defense's motion for a new trial.

On April 30, 1992, Fernandez filed a motion for an order permitting him to withdraw as Silva's counsel. Fernandez cited his "case load, case emphasis, office reformation/relocation as well as other personal matters," which "[did] not allow for the effective assistance of counsel with regards to [Silva]." The court granted Fernandez's motion, and, on May 18, 1992, appointed David Kuwahara as Silva's new counsel.

On June 23, 1992, Kuwahara filed a motion for stay of execution of Silva's sentence pending appeal,[3] essentially contending that Fernandez rendered ineffective assistance of counsel to Silva at trial by failing to subpoena

---

[3] We note that although the motion requested a "stay of execution of sentence," sentence had not yet been imposed. Subsequent to trial, sentencing was set for February 21, 1992, however, was continued for various reasons until June 30, 1992, the same day the court entertained Silva's motion for stay.

Lincoln as a witness. Attached to the motion as an exhibit was an affidavit from Lincoln, dated April 29, 1992, in which Lincoln claimed that: (1) Silva had tried to prevent Simpson from beating Lincoln more than he already had; (2) in the course of trying to pull Simpson off Lincoln, Silva was struck by Simpson several times; (3) Silva then merely tackled Simpson in an effort to stop him from further beating Lincoln; (4) Simpson may have sustained some of his injuries in the prior fight with Lincoln; (5) Silva had at no time struck Simpson with either his hands or his feet; (6) Miranda had left the house prior to the fight between Simpson and Lincoln; (7) he, Lincoln, had been treated at Castle Hospital for injuries received from Simpson; (8) he had not been served with a subpoena to testify on behalf of Silva at trial; and (9) he had a telephone conversation with Fernandez on December 17, 1991, when he told Fernandez that he had been beaten by Simpson on January 14, 1991.

Following a hearing on June 30, 1992, at which the prosecution argued that Fernandez had in fact made efforts to secure Lincoln's attendance at trial, the court denied the motion for stay of execution and sentenced Silva to a term of ten years imprisonment with a mandatory minimum of three years and four months as a repeat offender, mittimus to issue forthwith, and ordered Silva to pay restitution in the amount of $3,150.

Silva has timely appealed from the June 30, 1992 judgment of conviction and sentence, contending (1) that there was insufficient evidence presented at trial to convict him of assault in the first degree and (2) that Fernandez rendered him ineffective assistance of counsel at trial by failing to subpoena Lincoln as a defense witness.

## II. DISCUSSION
### A. Sufficiency of the Evidence

Silva first claims that there was insufficient evidence adduced at trial to support his conviction of assault in the first degree.

> On appeal, the test for a claim of insufficient evidence is whether, viewing the evidence in the light most favorable to the State, there is substantial evidence to support the conclusion of the trier of fact. *State v. Ildefonso*, 72 Haw. 573, 576, 827 P.2d 648, 651 (1992); *State v. Tamura*, 63 Haw. 636, 637, 633 P.2d 1115, 1117 (1981). " 'It matters not if a conviction under the evidence as so considered might be deemed to be against the weight of the evidence so long as there is substantial evidence tending to support the requisite findings for the conviction.' " *Ildefonso*, 72 Haw. at 576–77, 827 P.2d at 651 (quoting *Tamura*, 63 Haw. at 637, 633 P.2d at 1117). " 'Substantial evidence' . . . is credible evidence which is of sufficient quality and probative value to enable a [person] of reasonable caution to reach a conclusion.' " *See id.* at 577, 827 P.2d at 651 (quoting *State v. Naeole*, 62 Haw. 563, 565, 617 P.2d 820, 823 (1980)).

*State v. Matias*, 74 Haw. 197, 207, 840 P.2d 374, 379 (1992).

Silva's sole argument on the sufficiency issue is that the prosecution misconstrued the first degree assault statute, and that, as a result, the prosecution failed to present sufficient evidence at trial to convict him under the statute. Silva contends that the prosecution's sole piece of evidence regarding the "serious bodily injury"

element of HRS § 707–710 was the stipulated testimony of Dr. Behrendt that "the injuries to Audrey Simpson created a protracted loss or impairment of function of Mr. Simpson's right eye, a bodily member or organ[.]" We note that Dr. Behrendt's stipulated testimony specifically tracked the language of HRS § 707–700, which defines "serious bodily injury" as "bodily injury . . . which causes serious, permanent disfigurement, or *protracted loss or impairment of the function of any bodily member or organ*." (Emphasis added.)

Silva argues that the word "serious" in the definition is meant to modify both "permanent disfigurement" and "protracted loss or impairment of the function of any bodily member or organ." Silva maintains that, because Dr. Behrendt's stipulated testimony stated only that Simpson had suffered a protracted loss or impairment of his right eye and not a *serious* protracted loss or impairment, the prosecution failed to adduce sufficient evidence at trial to convict him under HRS § 707–710. We disagree.

First, it is clear from the plain phrasing of the applicable statutory definition that the word "serious" modifies only the first phrase — "permanent disfigurement" — and not the second phrase beginning with "protracted loss." Additionally, simple logic dictates that the word "serious" is only meant to modify the first phrase and not the second.

According to the RANDOM HOUSE COLLEGE DICTIONARY 380 (1979), a "disfigurement" is, in relevant part, "something that disfigures, as a scar," while to "disfigure" is "to mar the effect or excellence of." *Id.* Therefore, it follows that even a small but noticeable scar on a person's face, for example, is a disfigurement. However, such a scar would certainly not qualify as a "serious bodily injury" under the statutory definition nor should it. "Serious" is defined in

the dictionary as "giving cause for apprehension; critical." *Id.* at 1202. Conversely, a large, permanent scar on a person's face from the corner of the eye to the jaw, for example, would clearly be considered "serious bodily injury" under the statutory definition.

Moreover, the addition of the modifier "serious" would add nothing to the second applicable phrase other than redundancy. By its very nature, a "protracted loss or impairment of the function of any bodily member or organ" *is* a serious injury. "Member" is relevantly defined by the RANDOM HOUSE COLLEGE DICTIONARY as "a limb . . . a leg, arm, or wing." *Id.* at 833. It is incomprehensible that the protracted loss or impairment of a leg, an arm, or an eye, as in the present case, could be anything but "serious."

It is self–evident that Dr. Behrendt's stipulated testimony that Simpson suffered a protracted loss or impairment of his right eye was credible evidence of sufficient quality and probative value to assist a jury in reaching a conclusion. *See Matias*, 74 Haw. at 207, 840 P.2d at 379. The testimony thus constituted substantial evidence. Accordingly, we hold that Dr. Behrendt's stipulated testimony was sufficient evidence to convict Silva of assault in the first degree.

## B. **Ineffective Assistance of Counsel**

Silva's second contention is that he was rendered ineffective assistance of counsel, in violation of his constitutional right to assistance of counsel under both the sixth and fourteenth amendments to the United States Constitution and article I, § 14 of the Hawai'i State Constitution.

### 1.

The prosecution urges this court to adopt "the general rule that a criminal defendant may not assert ineffective

assistance of counsel for the first time on appeal." The prosecution contends that the question of ineffective assistance of counsel requires an independent hearing, which is mandated by HRPP Rule 40, to determine the relevant facts. The prosecution further contends that a Rule 40 hearing is the proper vehicle for such claims. The prosecution cites a number of federal and state cases in support of its position; however, we decline to adopt the proffered general rule.

HRPP Rule 40(a)(1) (1985) provides in relevant part:

> At any time *but not prior to final judgment*, any person may seek relief under the procedure set forth in this rule from the judgment of conviction . . . .

> For purposes of this rule, *a judgment is final* when the time for direct appeal under Rule 4(b) of the Hawai'i Rules of Appellate Procedure has expired without appeal being taken, or if direct appeal was taken, when the appellate process has terminated[.]

(Emphasis added.) Under the aforementioned rule, a convicted person cannot petition for a Rule 40 proceeding until the time for appeal has run or the appellate process has ended.

Moreover, Rule 40(a)(3) provides:

> **Inapplicability**. [A Rule 40] proceeding shall not be available and relief thereunder shall not be granted where the issues sought to be raised have been previously ruled upon or were waived. *An issue is waived if the petitioner knowingly and understandingly failed to raise it and it could have been raised* before the trial, at the trial, *on appeal*, in a habeas corpus proceeding or

any other proceeding actually conducted, or in a prior proceeding actually initiated under this rule, and the petitioner is unable to prove the existence of extraordinary circumstances to justify his failure to raise the issue. *There is a rebuttable presumption that a failure to appeal a ruling or to raise an issue is a knowing and understanding failure.*

(Emphasis added.)

Here, Silva was clearly aware of his ineffective assistance claim before the entry of judgment of conviction and sentence. In fact, Silva's motion for stay of execution of sentence was brought on the ground that he was rendered ineffective assistance of counsel due to his former attorney's failure to subpoena Lincoln as a witness, which motion was denied. Herein lies the dilemma — under the rule, Silva could not have directly petitioned for a Rule 40 proceeding until his appeal was completed. However, for purposes of Rule 40, Silva's failure to raise his ineffective assistance of counsel claim on appeal could be deemed "a knowing and understanding" waiver of such claim under Rule 40(a)(3). If this court refuses to entertain ineffective assistance claims for the first time on appeal, convicted defendants like Silva would/could be caught in a perfect "Catch–22." In other words, convicted defendants, who have, but fail to raise, an ineffective assistance claim on appeal could be completely precluded from bringing an ineffective assistance of counsel claim via a Rule 40 proceeding, and consequently, for review. This would obviously be an absurd and unjust result.

We acknowledge that HRPP Rule 40(a)(3) only requires a petitioner to have appealed an issue which "could have been raised . . . on appeal[.]" Arguably, if

we were to adopt the prosecution's suggested rule that ineffective assistance of counsel claims cannot be raised for the first time on appeal, such claims would not be considered one that "could have been raised" on appeal, and consequently, there could be no waiver. Thus, a convicted defendant with an ineffective assistance of counsel claim would never be precluded from bringing a Rule 40 petition upon completion of the appellate process.

Alternatively, convicted defendants could allow the time for taking a direct appeal to expire and then file a Rule 40 petition. However, allowing the appeal time to lapse presupposes that the convicted defendant has no other post–conviction claims. However, convicted defendants, like Silva and the large majority of other potential Rule 40 petitioners and appellants, almost always have multiple appealable issues in addition to an ineffective assistance of counsel claim. Under the prosecution's suggested rule, a convicted defendant could either (1) allow the time for appeal to run and forego all other appealable claims, if any, before filing a Rule 40 petition, or (2) appeal all issues, except for the ineffective assistance of counsel claim, then bring a Rule 40 petition when the appeal process is terminated.

We believe that requiring a convicted defendant to forego all other appealable claims simply because he or she wishes to pursue the ineffective assistance of counsel claim would be absurd and unjust. We likewise believe that requiring a defendant to wait until the appeal process is completed before raising a Rule 40 ineffective assistance claim would result in a waste of attorneys' fees and costs as well as an unnecessary expenditure of our limited judicial resources because, under the prosecution's suggested general rule, a defendant's post–

conviction claims would always be divided. We believe the confusion is manifest. For example, a decision on other issues in the appellate court may effectively moot an ineffective assistance claim. If we were to allow a Rule 40 ineffective assistance claim at the trial level during the pendency of an appeal of all other post–conviction issues, the trial court proceeding could run to conclusion before the appellate opinion was filed. Because a finding of ineffective assistance of counsel by the trial court would itself be appealable to this court by "[a]ny party" under HRPP Rule 40(h) (1989),[4] this court could find itself entertaining two separate appeals in the same case, possibly even at the same time.

Admittedly, the duplication of effort and the potential for confusion would be unavoidable in certain cases where, for example, the ineffective assistance claim comes to light after a direct appeal has been brought. Nevertheless, to adopt the prosecution's suggested general rule would cause needless confusion to the area of post–conviction procedure. We believe that piecemeal disposition of a defendant's post–conviction claims should be avoided whenever possible. Moreover, the prosecution's contention that an ineffective assistance of counsel claim requires an independent hearing to determine the relevant facts presupposes that the record on appeal is insufficient to support a ruling of ineffective assistance of counsel. However, in some instances, the ineffective assistance of counsel may be so obvious from the record that a Rule 40 proceeding would serve no purpose except

---

[4] HRPP Rule 40(h) provides that "[a]ny party may appeal to the supreme court from a judgment entered in the [Rule 40] proceeding in accordance with Rule 4(b) of the Hawai'i Rules of Appellate Procedure."

to delay the inevitable and expend resources unnecessarily. *See* **State v. Aplaca**, 74 Haw. 54, 837 P.2d 1298 (1992).

Accordingly, we refuse to adopt the prosecution's suggested general rule and shall continue to entertain ineffective assistance of counsel claims for the first time on appeal. We acknowledge, however, that not every trial record is sufficiently developed to determine whether there has been ineffective assistance of counsel; indeed, a defendant is often only able to allege facts that, if proved, would entitle him or her to relief. Therefore, we hold that where the record on appeal is insufficient to demonstrate ineffective assistance of counsel, but where: (1) the defendant alleges facts that if proven would entitle him or her to relief, and (2) the claim is not patently frivolous and without trace of support in the record,[5] the appellate court may affirm defendant's conviction without prejudice to a subsequent Rule 40 petition on the ineffective assistance of counsel claim.

### 2.

When an ineffective assistance of counsel claim is raised, the question is: "[When] viewed as a whole, [was] the assistance provided [to the defendant] 'within the range of competence demanded of attorneys in criminal

---

[5] HRAP 40(f) (1989) provides in relevant part:

If a petition alleges facts that if proven would entitle the petitioner to relief, the court shall grant a hearing which may extend only to the issues raised in the petition or answer. However, the court may deny a hearing if the petitioner's claim is patently frivolous and is without trace of support either in the record or from other evidence submitted by the petitioner.

cases[?]' " *State v. Smith*, 68 Haw. 304, 309, 712 P.2d 496, 500 (1986) (citations omitted). Additionally,

> [t]he defendant has the burden of establishing ineffective assistance of counsel and must meet the following two–part test: 1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense. *Id.*; *accord State v. Morishige*, 65 Haw. 354, 369, 652 P.2d 1119, 1130 (1982); *State v. Antone*, 62 Haw. 346, 348–49, 615 P.2d 101, 104 (1980); *Stough v. State*, 62 Haw. 620, 623, 618 P.2d 301, 304 (1980). This court will not judge the assistance provided the defendant ineffective solely by hindsight. *Smith*, 68 Haw. at 309, 712 P.2d at 500. A defendant who meets the two–prong test has proven the "denial of assistance 'within the range of competence demanded of attorneys in criminal cases.' " *Antone*, 62 Haw. at 349, 615 P.2d at 104.

*Aplaca*, 74 Haw. at 66–67, 837 P.2d at 1305.

Silva argues that his defense counsel rendered ineffective assistance by failing to adequately cross examine both Simpson and Miranda. Silva contends that his counsel should have elicited testimony from Simpson that he regained sight in his right eye after three days and that his vision thereafter was "only blurry," which information counsel should have gleaned from the preliminary hearing transcript.

Implicit in Silva's argument is the assumption that "mere" continuing blurry vision does not qualify as a

serious bodily injury under the assault statute because, although such may be considered a protracted loss or impairment, it is not a *serious* protracted loss or impairment. However, as previously discussed, a protracted loss or impairment of a bodily function or organ is, by definition, a serious injury. Thus, eliciting information from Simpson that his eyesight was "only" blurry would not have bolstered "a potentially meritorious defense." In fact, it might well have impaired his case by underlining for the jury the lingering effects of Simpson's injuries. Defense counsel's failure to elicit this information on cross examination does not qualify as ineffective assistance.

Silva also argues that his counsel should have pressed Simpson on the exact amount of alcohol he drank on the day of the incident and should have revealed Simpson's admitted use of marijuana on the day in question, which information was also available in the preliminary hearing transcript. However, "[d]efense counsel's tactical decisions at trial generally will not be questioned by a reviewing court." *State v. Antone*, 62 Haw. 346, 352, 615 P.2d 101, 106 (1980) (citation omitted). Lawyers require and are permitted broad latitude to make on–the–spot strategic choices in the course of trying a case. *State v. Kelekolio*, 74 Haw. 479, 524, 849 P.2d 58, 78 (1993); *State v. Smith*, 68 Haw. 304, 311, 712 P.2d 496, 501 (1986). Arguably, eliciting the foregoing information from Simpson might have given the jury a reason to doubt Simpson's testimony. On balance, however, we do not believe that the mere failure to elicit these facts rises to the level of ineffective assistance of counsel, especially in light of *Antone*.

With respect to the cross examination of Miranda, Silva argues that his counsel should have elicited testi-

mony regarding her admitted bad eyesight, which information could have been gleaned from Miranda's testimony at the preliminary hearing. The prosecution, however, maintains that although defense counsel did not question Miranda about her bad eyesight, he did extensively cross examine her about her version of the incident. Moreover, the prosecution points out that Miranda's testimony was substantially corroborated by two other witnesses. Although it could be argued that eliciting testimony regarding Miranda's bad eyesight may have strengthened Silva's case, on balance, we conclude that defense counsel's failure to do so does not rise to the level of ineffective assistance of counsel.

Silva's final argument on the ineffective assistance claim is that defense counsel failed to subpoena Lincoln Kaehu to appear and testify at trial. Silva contends that Lincoln's testimony was crucial to his claims of defense of another and self–defense because such testimony would have corroborated, and thus significantly supported, his own testimony regarding the incident. Silva implicitly argues that defense counsel's failure to subpoena Lincoln and secure his testimony at trial fulfills the two–prong test for ineffective assistance of counsel, namely that defendant counsel's failure to subpoena Lincoln Kaehu: (1) was an omission reflecting counsel's lack of skill, judgment, and diligence, and (2) resulted in the substantial impairment of a potentially meritorious defense.

Having reviewed the record, particularly Lincoln's post–trial affidavit regarding the incident, we believe that Lincoln's testimony could have significantly bolstered Silva's version of the incident and supported his justification theories of defense of another and self–defense.

The prosecution had presented three witnesses whose testimony regarding the incident was substantially similar while Silva's testimony was contrary and completely uncorroborated. Without Lincoln's testimony, the jury was more likely to have given greater weight to the testimony of the prosecution's witnesses because it was corroborated. The jury may well have discounted Silva's uncorroborated testimony as essentially self–serving and therefore doubtful.

This unfavorable impact on the jury is strongly suggested in the record by the jury communication to the court during its deliberations wherein the jury asked the court whether the defense could have called other witnesses and specifically named Lincoln. We believe that the jury could very well have concluded that the defense had opted not to call Lincoln because his testimony would not have corroborated Silva's version of the incident. We therefore conclude that the defense's failure to call Lincoln as a witness substantially impaired Silva's potentially meritorious defenses of justification and self–defense. *See Aplaca*, 74 Haw. at 72–73, 837 P.2d at 1308 (failure to call witnesses who would have bolstered defendant's credibility at trial in which defendant was sole defense witness held to constitute substantial impairment of a potentially meritorious defense).

We turn now to the question whether the failure to subpoena Lincoln qualifies as a specific omission reflecting counsel's lack of skill, judgment, and diligence. It is clear from the record that no subpoena was actually served on Lincoln. It is also undisputed that defense counsel's investigator succeeded in contacting Lincoln prior to trial, but that defense counsel failed to serve Lincoln with a subpoena to appear and testify at trial.

At the hearing on Silva's motion for new trial, defense counsel specifically stated that "[t]he sheriffs weren't able to subpoena [Lincoln], Your Honor. They tried, at least." Defense counsel's statement suggests that he attempted to have a subpoena served on Lincoln, but was not successful, in which case, defense counsel could not be blamed for the fact that Lincoln was not served with a subpoena and thus failed to testify at trial. If the sheriffs attempted to serve Lincoln with a subpoena at defense counsel's request, the fact that Lincoln was not served would not constitute an omission reflecting counsel's lack of skill, judgment, and diligence, and thus would not constitute ineffective assistance of counsel. However, we are unable to determine on the record before us the extent to which defense counsel or the sheriffs attempted to locate and serve Lincoln with a trial subpoena.

Moreover, although not mentioned by Silva as a further ground for his ineffective assistance claim, we note that defense counsel failed to appear at the hearing on his own motion to postpone the trial, which resulted in the trial court's summary denial of the motion. Defense counsel's absence is completely unexplained by the record. Arguably, if defense counsel had appeared at the hearing, he might have been able to convince the court of the necessity of postponing the trial; such postponement could have afforded him the additional time necessary to secure Lincoln's testimony. Defense counsel's inability to adequately explain his failure to appear at the aforementioned hearing could arguably be considered an omission reflecting counsel's lack of judgment and diligence.

Based on the foregoing discussion, we believe Silva has presented a claim alleging facts that, if proven, would entitle him to relief and that his claim is not patently frivolous and without trace of support in the record.

## III. CONCLUSION

Accordingly, we affirm Silva's conviction without prejudice to a subsequent HRPP Rule 40 petition on his claim of ineffective assistance of counsel.

On the briefs:

*Doraine F. Meyer*, Deputy Prosecuting Attorney, for plaintiff–appellee.

*David Kuwahara* for defendant–appellant.