107 P.3d 1203

**In the Interest of John DOE, Born on June 28, 1985, a Minor.**

**No. 26105.**

Intermediate Court of Appeals of Hawai'i.

Feb. 22, 2005.

Certiorari Denied March 21, 2005.

---

Jon N. Ikenaga, Deputy Public Defender, State of Hawaii, on the briefs, for respondent-appellant.

Loren J. Thomas, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee.

BURNS, C.J., WATANABE and LIM, JJ.

Opinion of the Court by LIM, J.

Minor appeals the July 30, 2003 judgment of disposition filed by the family court of the first circuit[1] that adjudicated him a law violator for assault in the first degree.[2] Minor

---

1. The Honorable Karen M. Radius presided.

2. Hawaii Revised Statutes (HRS) § 707–710(1) (1993) provides that, "A person commits the offense of assault in the first degree if the person intentionally or knowingly causes serious bodily injury to another person." HRS § 707–700 (1993) defines "serious bodily injury" as "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." HRS

§ 707–700 defines "bodily injury" as "physical pain, illness, or any impairment of physical condition." HRS §§ 702–206(1) and –206(2) (1993) provide:

(1) "Intentionally."
(a) A person acts intentionally with respect to his conduct when it is his conscious object to engage in such conduct.
(b) A person acts intentionally with respect to attendant circumstances when he is aware of

contends there was not sufficient evidence that he inflicted serious bodily injury, and that he did so intentionally or knowingly. We disagree, and affirm.

## I. Background.

Trial was held on July 14 and 30, 2003. The eighteen-year-old complainant testified that on September 1, 2002, in the very early morning hours, he and two of his male friends went to Nanakuli Beach Park to see another friend, a girl who was celebrating her nineteenth birthday. About fifty young people happened to be at the park, hanging out and drinking beer. According to the complainant, for some unknown reason, "Everybody was pretty much trying to fight with us—or I mean I just felt like heat." Eventually, the complainant and his friends decided to leave, but before they left, the complainant went around shaking hands. "I don't know their names but—because I didn't know anybody there, but I was just trying to, you know, be cool, show some respect and shake their hands before I left." Suddenly, the complainant was punched hard in the left temple. He fell to the ground on his hands and knees and was kicked in the face—in the mouth and in the eye—several times. The complainant did not see his assailant, but he did remember the last person he shook hands with before being attacked, and that was Minor.

"I broke—yeah, I fractured the top part of my jaw; four of my teeth was kicked in. I had a big—a big cut above my lip—not cut, but it went all the way through my lip. My eye was fractured.... And that's about it. I could have missed something, but I don't really remember that night too well. I'm not trying to remember it." Bleeding profusely, the complainant was driven to the emergency room. "Yes, they sewed up my lip and they gave me just painkillers and that's it. Later on that morning I had to go and try and pull my teeth out—I mean push them out because they were all the way in. I went to the orthopedic surgeon which was in Ala Moana.... He braced my teeth so it wouldn't fall out.... He was able to save the teeth, but I will need a root canal just to make sure they stay in place.... Yes, I went to Dr. Camara, which he just—he pretty much he did surgery on my eye to replace the floor of my eye.... I mean not to replace it but to make it so my eye wouldn't sink in. Sink." When asked about any aftereffects on his vision, the complainant explained, "It's not a major impact, but it definitely changed a little bit. Like I get double vision and I gotta really concentrate to read because my vision blurs out."

The girl the complainant went to see that night testified for the State. She knew Minor on a "hi and bye basis." She remembered that the atmosphere at the park turned menacing when the complainant and his friends arrived. In fact, as soon as the trio got out of their car, a boy ran up to one of them and asked him if he was looking for a fight. The girl tried to make the peace with the boys already there, whom only she knew, but the nimbus of impending violence continued to grow, so the girl urged the complainant and his friends to leave. The complainant was walking to his car to leave, but then he turned around and went back to shake hands. He shook hands with several people, then with Minor, and was turning to go when Minor punched him in the left side of the face. The complainant fell, and Minor kicked him hard in the face two or three times with a shod foot. The girl witnessed the attack from about six or seven feet away.

One of the complainant's companions that night also testified for the State. He essen-

---

the existence of such circumstances or believes or hopes that they exist.
(c) A person acts intentionally with respect to a result of his conduct when it is his conscious object to cause such a result.
(2) "Knowingly."
(a) A person acts knowingly with respect to his conduct when he is aware that his conduct is of that nature.

(b) A person acts knowingly with respect to attendant circumstances when he is aware that such circumstances exist.
(c) A person acts knowingly with respect to a result of his conduct when he is aware that it is practically certain that his conduct will cause such a result.

tially corroborated the State's case, but admitted he was in the car when the attack occurred and did not see the entire incident. He did not actually see the punch and the kicks land, but he did see Minor swinging his leg in a kicking motion. He acknowledged that there were other people nearby, and that he was not one hundred percent sure it was Minor who both punched and kicked the complainant.

Two of Minor's longtime friends testified in his behalf. Both were at the park drinking with Minor that night. Each maintained that Minor never left his side that night, except perhaps to "use the bathroom" on a nearby tree. Both remembered seeing or hearing a commotion across the way and going over with Minor to see what was going on. Both remembered seeing there the same boy, whom they identified by name, getting off of another boy who was on the ground. And each admitted not going to the authorities with his story, even though he had known all along that it was Minor who had gotten arrested for the assault.

Minor also testified in his defense. He was seventeen years old on the date of the offense. He remembered drinking at the park with his friends. He recalled shaking hands with the complainant, but maintained that was the full extent of his involvement with the complainant that night. Minor also told of hearing the commotion of a fight across the way and running over with his friends to see what was going on. When he got there, he saw the boy his friends had named, being pulled away from the fight by two other guys. He did not see the other party to the fight because too many people were circled around the site of the fight, blocking his view. Minor mentioned that he is right-handed, and that he had broken his right pinky finger playing football before the night of the fight. He was a football and baseball player in high school. He also remarked that the girl who testified against him had come on to him, unrequited, about six months before the incident. Minor's testimony marked the end of the first day of trial.

Dr. Jorge Camara (Dr. Camara), a board-certified ophthalmologist and an ophthalmic reconstructive surgeon, testified as such as an expert witness for the State. He was the only witness on the second and final day of trial. His testimony had been delayed due to scheduling difficulties.

Dr. Camara treated the complainant, via referral, on September 6, 2002:

Q. And can you describe [the complainant's] appearance on that date.

A. As I recall, he had an orbital hemorrhage on his left side and he had subconjunctival bleeding. He had slight inward movement of his left eye; in other words, the left eye was displaced posteriorly or backward compared to the right eye. He also, as I recall, had a sutured laceration on his mouth unrelated to his coming to see me. I just noticed that he had a laceration on his mouth.

Q. Okay. Can we break it down one by one.

When you say orbital hemorrhage of the left side, can you in lay terms tell us what that is.

A. In lay—in lay terms that might be called a black eye. He had obvious swelling of the left eye with discoloration, suggestive of blood within the socket of the eye, and the wrapping of the eye called the conjunctiva or the white part of the eye also was very, very red, suggestive again of having a hemorrhage.

Q. Okay. And when you said that the left eye there was some kind of displacement or—

A. The left eye appeared smaller than the right eye.

. . . .

Q. And did you review the CAT [computerized axial tomography] scan?

A. Yes.

Q. And what did you see?

A. It showed that [the complainant] had a fracture of the floor of the socket of

the eye. The floor is the part of the socket of the eye that supports the eye and the muscles of the eye.

Q. Is the floor a bone?

A. Yes.

Q. So did you physically examine [the complainant]?

A. Yes.

Q. And what did you find with respect to his eyes?

A. He had what appeared to be an orbital hemorrhage. He had retrodisplacement or backward displacement of the left eye compared to the right eye. He appeared to have double vision also in moving his eye toward looking upward.

Q. What is double vision?

A. Double vision is a medical term—it's also called diplopia—wherein if you look in one direction you see two as opposed to just seeing a single image.

Q. And how do you determine that somebody appears to have double vision? How do you check for—

A. There are two ways of doing that, one is by the patients relating to you or complaining of it and the second is by observing whether the eyes move together.

We usually get double vision when our eyes don't move exactly in the same direction and—or when there's limitation of the eye moving together, the patient will then complain of double vision.

Q. And what did you find with respect to the movement of [the complainant's] eyes when you examined him on September 6th?

A. He seemed—he seemed to have difficulty moving his left eye upward.

Q. And are the physical findings upon examination of [the complainant] consistent with what he told you about the incident?

A. Yes.

Q. Okay. Can you explain why they are consistent.

A. Well, they are consistent because usually when a patient presents with x-ray findings as well as physical findings of a fracture, the usual cause is trauma. One almost never gets a spontaneous fracture of the orbit, so putting together what he had told me about what had happened and the physical findings, I found that the findings, as well as the history, were consistent.

Dr. Camara decided to perform surgery on the complainant's left eye:

Usually if a fracture of the floor of the orbit is over 50 percent of the floor and a person engages in activities like running, jogging, playing basketball or any other sports, the pressure on the floor would eventually cause the tissues to sink into the floor and would lead to not only a smaller eye on that side but will also lead to problems like double vision.

If the person who had the fracture received even a minor injury, that whole complex of remaining bone could just cave in. There have been cases where the eye can just fall into the socket of the eye. It's not common but certainly someone who had a fracture that was unrepaired would be at risk for this happening in the future.

. . . .

Well, what would happen is the eye would be displaced downward into the sinus. The patient would have severe double vision and might be rendered incapacitated by that double vision. There would also usually be numbness of the nerve that gives feeling to your cheek and to your upper teeth. It passes right through the—that area of the floor. Loss of vision could also occur because of bleeding and the optic nerve being displaced and traumatized by either broken pieces of bone or by the nerve becoming displaced downward.

. . . .

We went in and opened up the lower part of the socket of the eye and we used a—we used a tracking system to—which

we use in surgery at Saint Francis [Medical Center] to determine the exact dimensions of the fracture itself and then we put back the tissues that had gone down into the upper part of the sinus and then we put an implant over the remaining bone to act as the new support for his eye.

On further direct examination, Dr. Camara was asked, "did the injury create a substantial risk of death?" Dr. Camara answered, "No." However, when Dr. Camara was shown a police department form he had filled out, he remembered that he had answered the same question in the affirmative, and explained:

Yes. When I filled this out, I was thinking more in terms of an injury of the severity that he had could have led him to have a subdural hematoma, independent of the fracture itself. Any injury that could rupture the bones of the socket of the eye could have also led to a subdural hematoma. That was the light in which I—I wrote this.

In answer to your question a moment ago, an orbital fracture by itself does not cause a risk of death.

Dr. Camara was also asked, "will the injury cause serious permanent disfigurement?" Dr. Camara replied:

The injury unrepaired could have caused serious disfigurement. It has been repaired, though. He has had repair of the fracture itself at this moment in time so he does need to be watched medically speaking because there is still long-term risks of having a repaired fracture, but the fracture at this time has been repaired.

Dr. Camara also opined regarding the complainant's continuing vision problems:

Q. Okay. With respect to the double vision, if the testimony was previously that there is still a problem of blurriness and double vision, would that be consistent with what you observed [of the complainant] in September of last year?

A. Yes.

. . . .

Q. Okay. And lastly, Dr. Camara, with respect to [the complainant's] injuries on September 1, 2002, would the blurry and double vision be considered an impairment of the function of any bodily member or organ?

A. Yes.

On cross-examination, Dr. Camara acknowledged that the surgery rendered it unlikely that the complainant's eye will sink back into his eye socket. Dr. Camara judged the surgery a success, and expected no permanent disfigurement of the complainant's left eye if healing goes well. Dr. Camara confirmed he had testified about the risk of a subdural hematoma, and not that the complainant had actually sustained such an injury. Dr. Camara agreed that trauma to the eye does not "automatically" result in a fractured orbital floor. That depends upon a number of factors, such as the force of the trauma and the strength of the orbital floor, which varies from person to person. But Dr. Camara pointed out that the orbital floor is "a very thin bone" and can be fractured by any trauma to the head. A direct blow to the eye is not a necessary precursor to an orbital floor fracture. Conversely, a direct blow to the eye can fracture the orbital floor yet leave the orbital rim intact.

Dr. Camara also responded at some length to defense counsel's queries regarding the complainant's continuing diplopia:

Q. Okay. And now regarding the double vision, was the double vision—is double vision correctable?

. . . .

A. Depends on what the reason for it is. If the question is in general, if double vision is correctable in general, it depends on what the cause is.

. . . .

A. Yes, what the cause is. So, say, if it's due to a stroke or due to an injury, as the nerve that gives the movement to the muscle of the eye heals or becomes more

normal, then the double vision would then eventually either get better or in some cases or most cases, depending again on the reason, could completely go away.

Q. Okay. What about in this case where double vision is caused by trauma?

A. It's hard to say. In my experience when it's caused by an injury, it depends on, one, the structures that are involved in the injury. For example, when you have a fracture to the bone of the orbit, as you might imagine, say, a fracture to the arm, the patient is hesitant to move the eye upward because it's impinging upon the broken bone.

. . . .

A. In those cases when you fix the fracture of the bone, the double vision will eventually get better and better and better and better. If, however, there's an injury to the nerve that interface the muscle of the eye that moves it upward, then that is difficult to predict because once your nerve is injured, either—either torn—

. . . .

A. —or actually contused, it's difficult to say. Usually we wait at least six months to a year to see how much of that function would come back again.

. . . .

A. I have not seen [the complainant] for about six months, so at the time I last saw him, he was newly healing from surgery and he would at that time still be expected to have some double vision, not just because of the injury itself but because of the surgery. When one does surgery, one re-injures in a way the socket again when we go in—

. . . .

A. —so it's not unusual for a patient to have double vision for some amount of time after surgery, but that should eventually—you know, we expect and hope that to get better with time.

. . . .

A. I just haven't seen him recently enough to comment.

Q. Okay. So I guess if I could sum up what you've told us, that double vision in [the complainant's] case—[the complainant's] double vision is correctable but it's too early to know?

A. Yes.

On redirect examination, Dr. Camara confirmed the possibility that the complainant's double vision and blurred vision will never completely abate.

After closing arguments, the family court ruled as follows:

The Court believes that this issue in this case revolves around credibility of [the girl witness] because we are clear [she] knows who you are, [Minor], okay? We are clear you were there that night. The question is what would be her motive for lying if she was going to lie, and, quite frankly, to believe that she would lie to accuse you of this you'd have to believe that she desperately wanted to be the hero for, quote, solving the crime and/or she's a woman spurned because you didn't fall in love with her. Okay?

I am clear that [she] is a street-wise young lady; however, given the evidence presented and looking at the credibility of both parties, the Court is going to adjudicate you, [Minor], on the charge of Assault in the First Degree. I believe she saw you hit her—hit him, excuse me. I believe that although she might not have seen your feet going, I believe she had both view to see your leg aiming and hitting him—kicking him, excuse me, so I adjudicate you of Assault in the First Degree.

There's no question it was serious-bodily injury. As far as intentionally or knowingly causing serious bodily injury, your actions speak for your knowing when you kick somebody in the face and punch somebody in the face, serious, serious injury can occur and did in this case.

## II. Discussion.

On appeal, Minor argues insuffi-

ciency of the evidence[3] in two respects. First, Minor contends there was not substantial evidence that he inflicted "serious bodily injury," which is the result-of-conduct element of assault in the first degree:

> A person commits the offense of assault in the first degree if the person intentionally or knowingly causes serious bodily injury to another person.

Hawaii Revised Statutes (HRS) § 707–710(1) (1993). Second, Minor avers there was not substantial evidence that he intentionally or knowingly caused that degree of bodily injury. *Id. See also State v. Aganon,* 97 Hawai'i 299, 302, 36 P.3d 1269, 1272 (2001) (" 'no person may be convicted of an offense unless . . . [t]he state of mind required to establish *each element of the offense* [,' including the result of conduct,] is proven beyond a reasonable doubt" (ellipsis, emphasis and some brackets in the original) (quoting HRS § 701–114 (1993) and citing HRS §§ 702–204 and –205 (1993)).

### A. There was Substantial Evidence that Minor Caused Serious Bodily Injury to the Complainant.

■ Minor argues first, that "Dr. Camara testified that [the complainant's] injuries did not create a substantial risk of death. Further, Dr. Camara stated that the injury did not cause serious permanent disfigurement." Opening Brief at 19 (citation to the record omitted). This argument addresses the first two of three elements of the definition of "serious bodily injury":

> "Serious bodily injury" means bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

HRS § 707–700 (1993) (definition of "serious bodily injury"). However, because the three elements are stated in the disjunctive, whether this argument is valid and its undergirding assertions accurate is a query of no ultimate consequence in this case, for we conclude that the third element of the definition was supported by substantial evidence. *See In re Doe,* 79 Hawai'i 265, 279, 900 P.2d 1332, 1346 (App.1995). In other words, we conclude there was substantial evidence that Minor inflicted "bodily injury . . . which cause[d] . . . protracted loss or impairment of the function of any bodily member or organ[,]" HRS § 707–700 (definition of "serious bodily injury")—namely, the eye injury that caused the blurred and diplopic vision that was still bothering the complainant at the time of the trial.

On this point, Minor notes that Dr. Camara never said the vision impairment was protracted. This void is of no consequence, for "protracted" is a commonly-understood word that needs no medical opinion to be parsed. If we and the supreme court have resorted to definitions in general dictionaries in that endeavor, *see State v. Yamashiro,* 8 Haw.App. 595, 600–01, 817 P.2d 123, 126–27 (1991),[4] *disapproved on other grounds, State v. Malufau,* 80 Hawai'i 126, 131 n. 8, 906 P.2d

---

3. "On a challenge to the sufficiency of the evidence, the evidence must be viewed 'in the strongest light for the prosecution[.]' *State v. Batson,* 73 Haw. 236, 248, 831 P.2d 924, 931 (1992). So long as there is 'substantial evidence' as to every material element of the offense the judgment of conviction will be upheld. *State v. Gabrillo,* 10 Haw.App. 448, 454, 877 P.2d 891, 894 (1994) (whether there was sufficient evidence to support a prima facie case requires an evaluation of the evidence as it relates to the elements of the crime). 'This standard of review is the same whether the case [is] tried before a judge or a jury.' *State v. Hernandez,* 61 Haw. 475, 478, 605 P.2d 75, 77 (1980). 'Substantial evidence' is 'credible evidence which is of sufficient quality and probative value to enable a man

of reasonable caution to support a conclusion.' *Batson,* 73 Haw. at 248–49, 831 P.2d at 931. In that connection, the assessment of a witness' credibility is for the factfinder. *State v. Cannon,* 56 Haw. 161, 166, 532 P.2d 391, 395–96 (1975)." *In re Doe,* 79 Hawai'i 265, 279, 900 P.2d 1332, 1346 (App.1995) (brackets in the original).

4. *See also State v. Yamashiro,* 8 Haw.App. 595, 601 n. 8, 817 P.2d 123, 127 n. 8 (1991), *disapproved on other grounds, State v. Malufau,* 80 Hawai'i 126, 131 n. 8, 906 P.2d 612, 617 n. 8 (1995):

> The Alaska court noted that the Alaska statute did not define "protracted impairment of a body member or organ" and looked to the dictionary for the meaning of those terms.

612, 617 n. 8 (1995); *State v. Silva*, 75 Haw. 419, 433–34, 864 P.2d 583, 590 (1993), we obviously see no necessity in a doctor's assistance.[5] In our view, impaired vision that lasts almost eleven months is protracted enough for purposes of HRS §§ 707–700 and –710(1). *Cf. Silva*, 75 Haw. at 440–41, 864 P.2d at 593 (in an assault case, blurred vision that lasted for a little more than twelve months was a protracted loss or impairment); *Yamashiro*, 8 Haw.App. at 601, 817 P.2d at 127 ("In *Walker v. State*, 742 P.2d 790 (Alaska Ct.App.1987), it was held that evidence of a broken jaw, which had to be wired shut for six weeks, established sufficient protracted impairment of the function of a body member or organ to allow a jury to find beyond a reasonable doubt that the defendant's actions constituted first-degree assault." (Footnotes omitted.)). In much the same vein, Minor points out that Dr. Camara deemed the complainant's diplopia correctable, but could not provide a prognosis because he had not seen the complainant recently enough to opine. This point posits that "protracted" means "permanent," which is clearly not the law. *Silva*, 75 Haw. at 440–41, 864 P.2d at 593; *Yamashiro*, 8 Haw.App. at 601, 817 P.2d at 127.

Minor also notes that Dr. Camara could not divine whether the continuing diplopia was caused by the traumatic injury or by the therapeutic surgery. By the same token, however, Dr. Camara did opine that the assault was one of the probable etiologies. This, coupled with the evidence detailing the assault and the subsequent medical procedures, all viewed in the light most favorable to the State, was substantial evidence that Minor caused serious bodily injury, *Doe*, 79

Hawai'i at 279, 900 P.2d at 1346, such that this point lacks merit. This conclusion would not change even if the lingering diplopia was due to the surgery after all, so long as the therapeutic surgery was necessitated by the traumatic injury.[6]

### B. There was Substantial Evidence that Minor Intentionally or Knowingly Caused Serious Bodily Injury to the Complainant.

■ Minor also avers:

None of the witnesses were able to describe the exact nature of the blows. Further, Dr. Camara testified that such injuries were not inevitably caused by punches or kicks, therefore Minor could not be said to have punched or kicked [the complainant] with the intent or knowledge that he would cause such injuries. Accordingly, Minor's adjudication must be reversed because there was no substantial evidence that he intentionally or knowingly caused "serious bodily injury."

Opening Brief at 17. Essentially, Minor is arguing that he must have known the precise instrumentality and the inevitable degree of injury before it can be said that he acted with a first degree state of mind. We disagree.

Given the difficulty of proving the requisite state of mind by direct evidence in criminal cases, proof by circumstantial evidence and reasonable inferences arising from circumstances surrounding the defendant's conduct is sufficient. *State v. Batson*, 73 Haw. [236,] 254, 831 P.2d [924,] 934 [ (1992) ] (holding that substantial circum-

---

"Protracted" is defined as "to draw out or lengthen in time or space." *Webster's Third New International Dictionary of the English Language Unabridged*, 1826 (1963). "Member" means, "a bodily part or organ." *Id.* at 1408. "Part," in turn, is defined as, "a portion of a plant or animal body. . . ." *Id.* at 1645, 906 P.2d 612.
*Walker v. State*, 742 P.2d 790, 791 (Alaska Ct.App.1987) (emphasis in original).

5. *Cf. State v. Swan*, 279 Mont. 483, 928 P.2d 933, 937 (1996) ("Expert medical testimony is not required to prove the permanency of an injury

where the permanency is undisputed and apparent from the nature of the injury itself." (Citation omitted.)).

6. *Cf. State v. Ewing*, 79 N.M. 489, 444 P.2d 1000, 1001 (1968) (where four gunshots were not in and of themselves fatal, but an infection originating at the site of a tracheotomy tube inserted for therapeutic purposes was, this was nevertheless substantial evidence that the defendant caused the death of the victim).

stantial evidence supported a trial court's conclusion that a defendant had knowingly caused his son's death).

The mind of an alleged offender may be read from his acts, conduct and inferences fairly drawn from all the circumstances. *Id.*

*State v. Eastman*, 81 Hawai'i 131, 141, 913 P.2d 57, 67 (1996). In our view, where an assailant punches and kicks another so ferociously in the face that the lip is split clean through, four teeth are bashed in, the eye is hemorrhaged and pushed inward, and the orbital floor is fractured causing blurred and diplopic vision lasting almost eleven months, there is substantial evidence, *Doe,* 79 Hawai'i at 279, 900 P.2d at 1346, that the assailant was, at the very least, "aware that it is practically certain that his conduct will cause" the result required for his conviction

of assault in the first degree, "serious bodily injury."[7] HRS § 702–206(2) (1993); HRS § 707–710(1); HRS § 707–700 (definition of "serious bodily injury").

### III. Conclusion.

Accordingly, the family court's July 30, 2003 judgment of disposition is affirmed.[8]

---

7. *Cf. State v. Eastman*, 81 Hawai'i 131, 141, 913 P.2d 57, 67 (1996):

    Moreover, we have held that persons of ordinary intelligence would have a reasonable opportunity to know that causing physical injury by punching someone in the face would constitute physical abuse. *State v. Kameenui,* 69 Haw. 620, 623, 753 P.2d 1250, 1252 (1988). Absent a legal justification or excuse, a slap on the side of the head involves, at a minimum, a substantial and unjustifiable risk, i.e., "a gross deviation from the standard of conduct that a law-abiding person would observe in the same situation." HRS § 702–206(3)(d) (1993).

    The same substantial evidence showing that Eastman slapped Bautista on the side of her head also supports a finding that, at a minimum, Eastman consciously disregarded a substantial and unjustifiable risk of physically abusing Bautista. Therefore, the prosecution provided substantial evidence from which the trial court could infer that Eastman physically abused Bautista with the minimum requisite state of mind, *i.e.,* recklessness, for a conviction under HRS § 709–906(1) [ (Supp.1994) ].

8. By the same token, the supporting findings of fact (# 17 and # 19) and conclusions of law (# 2 and # 3) that Minor attacks on appeal are not erroneous.