95 P.3d 952

STATE of Hawai'i, Plaintiff–Appellant,

v.

Frances VIGLIELMO, Defendant–Appellee.

No. 24132.

Supreme Court of Hawai'i.

Aug. 11, 2004.

R. Steven Geshell, Honolulu, on the briefs, for the defendant-appellant Frances Viglielmo.

Alexa D.M. Fujise, deputy prosecuting attorney, on the briefs, for the plaintiff-appellant State of Hawai'i.

MOON, C.J., LEVINSON, NAKAYAMA, and DUFFY, JJ., and ACOBA, J., Dissenting.

Opinion of the Court by LEVINSON, J.

The defendant-appellant Frances E. Viglielmo appeals from the judgment and sentence of the district court of the first circuit, the Honorable Barbara P. Richardson presiding, filed on October 9, 2003,[1] convicting her of and sentencing her for the offense of trespass in the second degree, in violation of Hawai'i Revised Statutes (HRS) § 708–814(1)(b) (1993 & Supp.2003).[2] On appeal, Viglielmo contends that the district court

---

1. On October 1, 2003, this court remanded the present matter to the district court for the entry of a written judgment pursuant to *State v. Bohannon*, 102 Hawai'i 228, 74 P.3d 980 (2003). On October 9, 2003, the district court filed a written judgment of conviction and sentence.

2. HRS § 708–814(1)(b) provides:

(1) A person commits the offense of criminal trespass in the second degree if:

. . . .

(b) The person enters or remains unlawfully in or upon commercial premises after reasonable warning or request to leave by the owner or lessee of the commercial premises or the owner's or lessee's authorized agent or police officer; provided that this paragraph shall not apply to any conduct or activity subject to regulation by the National Labor Relations Act.

For purposes of this section, "reasonable warning or request" means a warning or request communicated in writing at any time within a one-year period inclusive of the date the incident occurred, which may contain but is not limited to the following information:

(i) A warning statement advising the person that the person's presence is no longer desired on the property for a period of one year from the date of the notice, that a violation of the warning will subject the person to arrest and prosecution for trespassing pursuant to section 708–814(1)(b), and that criminal trespass in the second degree is a petty misdemeanor;

(ii) The legal name, any aliases, and a photograph, if practicable, or a physical description, including but not limited to sex, racial extraction, age, height, weight, hair color, eye color, or any other distinguishing characteristics, of the person warned;

(iii) The name of the person giving the warning along with the date and time the warning was given; and

(iv) The signature of the person giving the warning, the signature of a witness or police officer who was present when the warning was given and, if possible, the signature of the violator.

(2) Criminal trespass in the second degree is a petty misdemeanor.

'erred (1) in denying her motions to dismiss and (2) in finding her guilty, inasmuch as HRS § 708-814(1)(b) is unconstitutional on its face and as applied to her, in violation of article I, sections 2, 4, and 5 of the Hawai'i Constitution (1978) [3] and the first and fourteenth amendments to the United States Constitution,[4] given the facts that she was (a) exercising her constitutional right to free speech and thus not unlawfully present on the Ala Moana Shopping Center's premises and (b) a "business invitee" of the shopping center and invited to use the center as a "public place."

We hold that the district court did not err, on first amendment grounds, in denying Viglielmo's motions to dismiss or in finding her guilty, inasmuch as (1) the district court's decisions did not run afoul of federal constitutional case law and (2) Viglielmo's expressive conduct on the premises of Ala Moana Shopping Center was not protected under the first amendment to the United States Constitution. Additionally, we hold that article I, section 4 of the Hawai'i Constitution affords Viglielmo no greater free speech protection than the first amendment to the United States Constitution and that she is therefore not insulated from criminal liability under HRS § 708-814(1)(b).

## I. BACKGROUND

The present matter arises out of an incident that occurred on December 15, 2000, in which Viglielmo was peaceably protesting the sale of military toys to children in front of Kay–Bee Toys, located in the Ala Moana Shopping Center (Ala Moana), in the City and County of Honolulu. The prosecution adduced the following testimony at Viglielmo's bench trial, which the district court conducted on February 13, 2001.

At approximately 11:30 a.m., Viglielmo was standing on a sidewalk in front of Kay–Bee Toys holding a sign that read: "Stop selling war hero toys to kids. Adults who plant mines, drop bombs, fire missiles, kill kids. Boycott Kay–Bee till military figures are sold only to adults!" Viglielmo was also handing out pamphlets. Viglielmo was not shouting, creating a public disturbance, or impeding people from entering Kay–Bee Toys.

John Alves was a safety and security officer employed by Ala Moana on December 15, 2000. Alves saw Viglielmo with her sign and observed her distributing pamphlets, at which time he waited for his supervisor, and together they approached Viglielmo. Alves and his supervisor, acting as representatives of Ala Moana, informed Viglielmo that she could neither picket nor distribute pamphlets on Ala Moana's premises, which was private property. Viglielmo refused to leave, stating that Ala Moana was a public facility. Ala Moana's assistant director of security also arrived to inform Viglielmo that she could not picket or distribute pamphlets on Ala Moana's premises. Viglielmo again refused to leave. Alves then requested police assistance. Honolulu Police Department (HPD) Officer Antonio Bustamante was sent by police dispatch to Ala Moana. Upon Officer Bustamante's arrival, he first spoke to Alves and his supervisor and then to Viglielmo, explaining to her that she could protest on

---

**3.** Article I, section 2 of the Hawai'i Constitution provides:

All persons are free by nature and are equal in their inherent and inalienable rights. Among these rights are the enjoyment of life, liberty and the pursuit of happiness, and the acquiring and possessing of property. These rights cannot endure unless the people recognize their corresponding obligations and responsibilities.
Article I, section 4 of the Hawai'i Constitution provides in relevant part that "[n]o law shall be enacted ... abridging the freedom of speech[.]"
Article I, section 5 of the Hawai'i Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws, nor be denied the enjoyment of the per-

son's civil rights or be discriminated against in the exercise thereof because of race, religion, sex or ancestry."

**4.** The first amendment to the United States Constitution provides in relevant part that "Congress shall make no law ... abridging the freedom of speech[.]"

The fourteenth amendment to the United States Constitution provides in relevant part:
No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

the public street, but not on Ala Moana's private property. Viglielmo again refused to leave. Alves and his supervisor issued Viglielmo a written trespass warning, which stated in relevant part:

This is a trespass warning issued to you as provided in the Hawaii Revised Statutes. I am Johnnual Alves, an authorized agent representing GGP Ala Moana L.L.C., the owner of this property, situated at 1450 Ala Moana Blvd. You are hereby warned that your presence is not welcome on or within the above premises, including, but not limited to, any commercial establishment, parking area, common area, and structure. You are directed to immediately leave and not return to this property or premises for a period of one (1) year.

Failure to comply with this warning is in direct violation of Section 708–814 of the Hawaii Penal Code and may subject you to arrest and criminal prosecution which may result in a fine or incarceration, or both.

SECTION 708–814 CRIMINAL TRESPASS IN THE SECOND DEGREE

"A person commits the offense of criminal trespass in the second degree if . . .

(b) He/she enters or remains unlawfully in or upon commercial premises after the reasonable warning or request to leave by the owner or lessee of the commercial premises or his authorized agent or police officer . . ."

On 12–15–00, at 1145 hours, the above notice was read and a copy presented to [Viglielmo]. . . .

Viglielmo refused to sign the trespass warning, and Alves issued her a copy.

Officer Bustamante called his sergeant over to explain to Viglielmo that she was required to leave, after which the Ala Moana security officers and the HPD officers renewed their request to Viglielmo that she leave the premises. Officer Bustamante then placed Viglielmo under arrest for failing to comply with the officers' requests to leave Ala Moana property.

On January 11, 2001, Viglielmo filed a pretrial motion to dismiss, pursuant to Hawai'i Rules of Penal Procedure (HRPP) Rule 12(b) (2001),[5] wherein she argued that HRS § 708–814(1)(b), *see supra* note 2, was unconstitutional on its face and as applied to her, in violation of article I, sections 2, 4, and 5 of the Hawai'i Constitution and the first and fourteenth amendments to the United States Constitution, inasmuch as prosecuting her pursuant to HRS § 708–814(1)(b) prevented her from exercising her constitutional right to free speech and deprived her of her enjoyment of life, liberty, and the pursuit of happiness.

On February 13, 2001, the district court conducted a pretrial hearing on Viglielmo's motion to dismiss and proceeded to arraign Viglielmo on the charge of criminal trespass in the second degree, *see supra* note 2. The district court denied Viglielmo's motion to dismiss, stating that "the [c]ourt does find that the statute is not unconstitutional and therefore the [c]ourt will deny the motion to dismiss." That same morning, the district court conducted a bench trial on the charged offense. At Viglielmo's bench trial, Officer Bustamante and Alves testified to the foregoing summary of events. In addition to Officer Bustamante's and Alves's testimony, the prosecution introduced into evidence, and the defense stipulated to, the pamphlet that Viglielmo was distributing and the written trespass warning issued to Viglielmo.

At the close of the prosecution's case-in-chief, Viglielmo again moved to dismiss the charge, during which the following colloquy occurred:

[DEFENSE COUNSEL]: I'd like . . . [to] make a motion to dismiss again for the reason that the constitutional rights of my client have been violated by this [p]rosecution as previously asserted in the motion to dismiss.

Secondly, the State has failed to prove that my client was not invited, which is an element of the offense. The State has also failed to prove the state of mind required to violate this statute[,] to wit: that she

---

5. Although Viglielmo does not specify, she presumably filed her pretrial motion to dismiss under HRPP Rule 12(b)(2), which states that "de-

fenses and objections based on defects in the charge" must be raised prior to trial.

acted intentionally or knowingly and recklessly or negligently to violate the statute with the state of mind required and, therefore, this Court should find her not guilty and dismiss at this time.

THE COURT: [Deputy prosecuting attorney (DPA) ]?

[DPA]: [T]he State has proven at least by a prima facie case that all the elements have been met; not invited is not an element. All that is required by the statute is that she was asked to leave by the owner and that she refused to leave. And we had testimony by Mr. Alves that he was an authorized representative of Ala Moana at the time; so he meets the requirements that she was asked to leave by an agent or an owner as well as she was asked to leave by a police officer. So we feel those elements have all been met. State of mind can be inferred by [Viglielmo] refusing over four times by many different people to leave the area. State has at least put on a prima facie case, Your Honor.

THE COURT: Taking the evidence in the light most favorable to the State, the Court finds that there has been a prima facie case presented to the Court and therefore the Court will deny the motion.

Viglielmo testified on her own behalf at trial. She stated that she had never seen any signs in Ala Moana shopping center prohibiting her from leafleting or picketing, that she was not creating a disturbance, and that she considered the common areas of Ala Moana to be "free speech and free assembly turf." In addition to Viglielmo's own testimony, through Defendant's Exhibits A through D, stipulated into evidence by the prosecution, she adduced the following information regarding Ala Moana at trial. Ala Moana is situated on fifty acres, hosts over two million people each month, houses more than two hundred retail stores, holds nearly 550 performances each year, includes a central bus transfer station that averages 2,100 buses per day, and has 8,500 parking spaces, a United States Post Office, and a Honolulu satellite city hall.

After the defense rested, Viglielmo renewed her motion to dismiss on the same constitutional grounds raised previously.

The district court heard final arguments prior to ruling on the evidence and Viglielmo's final motion to dismiss. The district court subsequently found Viglielmo guilty of the charged offense, remarking as follows:

. . . .

The Court finds the facts to be that [Viglielmo] remained unlawfully on the premises of Ala Moana Shopping Center[,] which was a commercial premise[s]; that [Viglielmo] was given reasonable requests to leave verbally and also a written warning … was given, that is Exhibit 3, offered by the State and stipulated into evidence by the defense. The Court also finds that the owner of the property or its agent … did give [Viglielmo] a warning and a request to leave the premises. A police officer also gave the defendant a request to leave the premises of Ala Moana Shopping Center. [Viglielmo] refused to leave and … [Viglielmo's] conduct was not … subject to regulation by the National Labor Relations Act. The Court finds that the written warning or request to leave was communicated to [Viglielmo] clearly.

Therefore, the Court does find that [Viglielmo] committed the offense of criminal trespass in the second degree and finds [Viglielmo] guilty.

Having found Viglielmo guilty of criminal trespass in the second degree, *see supra* note 2, the district court sentenced her to a six-month term of probation and a one hundred dollar fine. On February 28, 2001, Viglielmo filed a timely notice of appeal.

## II. *STANDARDS OF REVIEW*

### A. *Sufficiency of the Evidence*

We have long held that evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or a jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence

to support the conclusion of the trier of fact.

*State v. Batson,* 73 Haw. 236, 248, 831 P.2d 924, 931, *recon[sideration] denied,* 73 Haw. 625, 834 P.2d 1315 (1992) (citations omitted); *see also State v. Silva,* 75 Haw. 419, [434], 864 P.2d 583, 590 (1993) (citations omitted). " 'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a [person] of reasonable caution to support a conclusion." *Batson,* 73 Haw. at 248–49, 831 P.2d at 931 (citation omitted). *See also Silva,* 75 Haw. at [432], 864 P.2d at 590 (quoting *State v. Matias,* 74 Haw. 197, 207, 840 P.2d 374, 379 (1993) [ (1992) ] ); *State v. Aplaca,* 74 Haw. 54, 64–65, 837 P.2d 1298, 1304 (1992) (citations omitted).

*In the Interest of John Doe, Born on January 5, 1976,* 76 Hawai'i 85, 92–93, 869 P.2d 1304, 1311–12 (1994); *see also State v. Valdivia,* 95 Hawai'i 465, 471, 24 P.3d 661, 667 (2001).

*State v. Martinez,* 101 Hawai'i 332, 338–39, 68 P.3d 606, 612–13 (2003).

## B. *Questions of Constitutional Law*

██ "We answer questions of constitutional law 'by exercising our own independent judgment based on the facts of the case,' " and, thus, questions of constitutional law are reviewed on appeal "under the 'right/wrong' standard." *State v. Jenkins,* 93 Hawai'i 87, 100, 997 P.2d 13, 26 (2000) (citations omitted).

*State v. Kaua,* 102 Hawai'i 1, 7, 72 P.3d 473, 479 (2003) (quoting *State v. Aplaca,* 96 Hawai'i 17, 22, 25 P.3d 792, 797 (2001)).

██ "Whether speech is protected by the first amendment [to the United States Constitution], as applied to the states through the due process clause of the fourteenth amendment, is a question of law which is freely reviewable on appeal." *In re John Doe,* 76 Hawai'i at 93, 869 P.2d at 1312 (quoting *State v. Chung,* 75 Haw. 398, 415, 862 P.2d 1063, 1072 (1993) (citing *Rankin v. McPherson,* 483 U.S. 378, 386 & n. 9, 107 S.Ct. 2891, 97 L.Ed.2d 315, *reh'g denied,* 483 U.S. 1056, 108 S.Ct. 31, 97 L.Ed.2d 819

(1987))). "Correlatively, '[o]ur customary deference to the trial court upon essentially a factual question is qualified by our duty to review the evidence ourselves in cases involving a possible infringement upon the constitutional right of free expression.' " *Id.* (quoting *State v. Nelson,* 38 Conn.Supp. 349, 448 A.2d 214, 217 (1982) (citing, *inter alia, Jacobellis v. Ohio,* 378 U.S. 184, 190, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964))).

## C. *Statutory Interpretation*

██ "[T]he interpretation of a statute ... is a question of law reviewable de novo." *State v. Arceo,* 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996) (*quoting State v. Camara,* 81 Hawai'i 324, 329, 916 P.2d 1225, 1230 (1996) (citations omitted)). *See also State v. Toyomura,* 80 Hawai'i 8, 18, 904 P.2d 893, 903 (1995); *State v. Higa,* 79 Hawai'i 1, 3, 897 P.2d 928, 930 (1995); *State v. Nakata,* 76 Hawai'i 360, 365, 878 P.2d 699, 704 (1994)....

*Gray v. Administrative Director of the Court,* 84 Hawai'i 138, 144, 931 P.2d 580, 586 (1997) (some brackets added and some in original). *See also State v. Soto,* 84 Hawai'i 229, 236, 933 P.2d 66, 73 (1997). Furthermore, our statutory construction is guided by established rules:

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists....

In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) [ (1993) ]. Moreover, the courts may resort to extrinsic aids in

determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

*Gray,* 84 Hawai'i at 148, 931 P.2d at 590 (*quoting State v. Toyomura,* 80 Hawai'i 8, 18–19, 904 P.2d 893, 903–04 (1995)) (brackets and ellipsis points in original) (footnote omitted). This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it ... to discover its true meaning." HRS § 1–15(2)(1993). "Laws *in pari materia,* or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." HRS § 1–16 (1993).

*Kaua,* 102 Hawai'i at 7–8, 72 P.3d at 479–480 (quoting *Rauch,* 94 Hawai'i at 322–23, 13 P.3d at 331–32 (quoting *State v. Kotis,* 91 Hawai'i 319, 327, 984 P.2d 78, 86 (1999) (quoting *State v. Dudoit,* 90 Hawai'i 262, 266, 978 P.2d 700, 704 (1999) (quoting *State v. Stocker,* 90 Hawai'i 85, 90–91, 976 P.2d 399, 404–05 (1999) (quoting *Ho v. Leftwich,* 88 Hawai'i 251, 256–57, 965 P.2d 793, 798–99 (1998) (quoting *Korean Buddhist Dae Won Sa Temple v. Sullivan,* 87 Hawai'i 217, 229–30, 953 P.2d 1315, 1327–28 (1998)))))))).

## III. DISCUSSION

### A. First Amendment Free Speech Protections Do Not Insulate Viglielmo From Prosecution For Criminal Trespass In The Second Degree.

 Viglielmo argues that the district court erred in denying her motions to dismiss prior to trial, at the close of the prosecution's case, and at the close of the evidence, inasmuch as her prosecution, pursuant to HRS § 708–814(1)(b), "violated her constitutional rights to free speech, assembly, due process, and equal protection, and deprived her of enjoyment of life, liberty, and the pursuit of happiness," as guaranteed by the first and fourteenth amendments to the United States Constitution and article I, sections 2, 4, and 5 of the Hawai'i Constitution.[6] In each motion to dismiss, Viglielmo asserts the aforementioned constitutional grounds as bases for dismissal of the charge against her.[7] Viglielmo likewise advances the same

---

**6.** As discussed *infra,* Viglielmo's constitutional challenge to HRS § 708–814(1)(b), *see supra* note 2, is primarily "as applied" to her, inasmuch as she was exercising her constitutionally-protected right to free speech. Viglielmo also advances an argument that HRS § 708–814(1)(b) is facially unconstitutional because it exempts from its purview any conduct or activity subject to regulation by the National Labor Relations Act (NLRA). Viglielmo contends that if holding a sign in protest in front of Kay-Bee Toys in Ala Moana was conduct regulated under the NLRA it could not be prosecuted, thus discriminating "invidiously" against her by restricting her constitutional right to free speech, which would otherwise be protected under the NLRA. In support of her claim, Viglielmo cites only *City of Ladue v. Gilleo,* 512 U.S. 43, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994), which held a city ordinance banning all residential signs but those falling within one of ten exemptions violated residents' free speech rights. *Ladue* is inapposite, inasmuch as it has nothing to do with the NLRA.

Furthermore, if Viglielmo's facial challenge to HRS § 708–814(1)(b) were to succeed, her conduct would have to be subject to regulation by the NLRA, which it clearly was not. The NLRA only governs relationships between employers and employees; Viglielmo was not employed by Ala Moana or any of its retail stores and was not protesting an employer's labor practices or engaged in any other activity regulated by the NLRA.

Experience has proved that protection by law of the right of employees to organize and bargain collectively safeguards commerce from injury, impairment, or interruption, and promotes the flow of commerce by removing certain recognized sources of industrial strife and unrest, by encouraging practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions, and by restoring equality of bargaining power between employers and employees.

29 United States Code (U.S.C.) § 151.

**7.** Viglielmo's motion to dismiss at the close of the prosecution's case, however, asserted for the first time that the prosecution had failed to prove that she possessed the requisite state of mind to commit trespass in the second degree, namely, that she acted "intentionally, knowingly, recklessly, or negligently[.]" Viglielmo also orally renewed her motion for a dismissal at the close of the prosecution's case with respect to her argument that her constitutional rights were violated by the mere fact of her prosecution. Nevertheless, to the extent that Viglielmo argued that the prosecution failed to prove that she possessed the requisite state of mind to violate HRS § 708–814(1)(b), the district court was correct in treating Viglielmo's motion to dismiss, effectively, as a motion for judgment of acquittal, pursuant to HRPP Rule 29(a) (2001), by ruling that "[t]aking

position in support of her contention that the district court erred in finding her guilty of criminal trespass in the second degree, additionally arguing that she was a "business invitee" of Ala Moana and part of the public invited to use the shopping center as a "public place."

. Viglielmo submits that she was "simply exercising her [f]irst [a]mendment rights to protest the sale of military toys . . . on the sidewalk in the common area of the shopping center." Specifically, Viglielmo posits that Ala Moana is "like a small city" and that she was "engaged in her constitutionally protected rights on the sidewalk outside the store of this small city." Viglielmo maintains that the evidence admitted at trial, showing that Ala Moana is a large shopping center and gathering place, "compels the conclusion that this is a public area. . . ." Ala Moana being akin to a municipality, Viglielmo submits that her constitutional right to free speech is protected therein, and she may protest on the sidewalks of the common areas of the shopping center. Considering Viglielmo's claims in the context of federal constitutional law, other states' case law, and in light of the Hawai'i Constitution, we find Viglielmo's arguments to be unpersuasive. Because we have not previously been called upon to determine whether to interpret the free speech provision of Hawaii's constitution more broadly than its federal counterpart, we first discuss the United States Supreme Court's pronouncements on the balance between free speech and private property rights and then look for guidance to the opinions of other courts that have considered similar matters.

### 1. *The first amendment to the United States Constitution*

 The relevant portion of the first amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. Freedom of speech is "among the fundamental personal rights and 'liberties' protected by the due process clause of the [f]ourteenth [a]mendment from impairment by the [s]tates." *In re John Doe*, 76 Hawai'i at 93 n. 15, 869 P.2d at 1312 n. 15 (quoting *Gitlow v. New York*, 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925)). The constitutional guarantee of free speech, as applied to the states through the fourteenth amendment, "is a guarantee only against abridgment *by government, federal or state*." *Hudgens v. NLRB*, 424 U.S. 507, 513, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976) (emphasis added). "[W]hile statutory or common law may in some situations extend protection or provide redress against a private corporation or person who seeks to abridge the free expression of others, no such protection or redress is provided by the Constitution itself." *Id.* Thus, the abridgment of the free-

---

the evidence in the light most favorable to the State, the Court finds that there has been a prima facie case presented to the Court and therefore the Court will deny the motion." HRPP Rule 29(a) provides in pertinent part that "[t]he court on motion of a defendant . . . shall order the entry of judgment of acquittal of one or more offenses alleged in the charge after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense. . . ."

With regard to Viglielmo's argument that the prosecution failed to prove that she possessed the requisite state of mind to commit second degree criminal trespass, the governing statute is HRS § 702–204, which provides in relevant part that "[w]hen the state of mind required to establish an element of an offense is not specified by the law, that element is established if, with respect thereto, a person acts intentionally, knowingly, or recklessly." The prosecution adduced testimony that Viglielmo "knowingly" refused to leave the premises after repeated requests from Ala Moana's authorized agents and HPD officers

to do so, thereby subjecting herself to arrest. Thus, Viglielmo's citation of *State v. Cavness*, 80 Hawai'i 460, 463–466, 911 P.2d 95, 98–101 (1996) ("Since no state of mind is specified in HRS § 708–814(1)(b), . . . the 'intentionally, knowingly, or recklessly' state of mind applies."), actually undermines her position. The district court did not err in (1) finding that the prosecution made a "prima facie case" and (2) denying Viglielmo's motion "for judgment of acquittal" at the close of the prosecution's case-in-chief.

Moreover, Viglielmo's claim that she lacked the requisite state of mind is, in essence, a mistake of law claim—*i.e.*, Viglielmo could not violate HRS § 708–814(1)(b) because she believed she had a constitutional right of free speech to protest on the Ala Moana premises—which is no longer authorized by HRS § 702–218 (1993), *see Cavness*, 80 Hawai'i at 464, 911 P.2d at 99, and is subsumed within her constitutional argument. Hence, we address Viglielmo's claim that the district court erred in denying her motion to dismiss III.A.6. through III.B:5.

dom of speech must involve some form of governmental action.

### 2. *Marsh v. Alabama*

An exception to the requirement of government action, however, was delineated in *Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), when the United States Supreme Court found the right to free speech protected in the "business block" of a company town where that town had all the characteristics of a state-created municipality. In *Marsh*, a Jehovah's Witness who distributed literature without permission on a sidewalk in Chickasaw, Alabama, was convicted of criminal trespass. Chickasaw was a "company town," wholly owned by the Gulf Shipbuilding Corporation, which the Court described as follows:

> The property consists of residential buildings, streets, a system of sewers, a sewage disposal plant and a 'business block' on which business places are situated. A deputy of the Mobile County Sheriff, paid by the company, serves as the town's policeman. Merchants and service establishments have rented the stores and business places on the business block and the United States uses one of the places as a post office from which six carriers deliver mail to the people of Chickasaw and the adjacent area. The town and the surrounding neighborhood, which can not be distinguished from the Gulf property by anyone not familiar with the property lines, are thickly settled, and according to all indications the residents use the business block as their regular shopping center. To do so, they now, as they have for many years, make use of a company-owned paved street and sidewalk located alongside the store fronts in order to enter and leave the stores and the post office. Intersecting company-owned roads at each end of the business block lead into a four-lane public highway which runs parallel to the business block at a distance of thirty feet.... In short the town and its shopping district are accessible to and freely used by the public in general and there is nothing to distinguish them from any other town and shopping center except the fact that the title to the property belongs to a private corporation.

*Id.* at 502–503, 66 S.Ct. 276.

The United States Supreme Court refused to accept the argument that, because all property interests in the town were held by a single company, it was "enough to give that company power, enforceable by a state statute, to abridge [first amendment] freedoms." *Id.* at 505, 66 S.Ct. 276. "Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." *Id.* at 506, 66 S.Ct. 276 (internal citation omitted).

### 3. *Amalgamated Food Employees Union, Local 590 v. Logan Valley Plaza*

*Marsh* was only briefly extended by *Amalgamated Food Employees Union, Local 590 v. Logan Valley Plaza*, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968), when the United States Supreme Court held that the peaceful picketing aimed at a store within a shopping mall, and carried out in the privately owned parking lot adjacent to the mall, was protected by the first amendment based on equating the shopping mall to the "business block" in *Marsh*. Nonetheless, Justice White's dissent in *Logan Valley* signaled an imminent narrowing of *Marsh's* purview:

> [T]he company town [in *Marsh*] was found to have all of the attributes of a state-created municipality and the company was found effectively to be exercising official power as a delegate of the State. In the context of that case, the streets of the company town were as available and as dedicated to public purposes as the streets of an ordinary town. The company owner stood in the shoes of the State in attempting to prevent the streets from being used as public streets are normally used. The situation here is starkly different.... Logan Valley Plaza is not a town but only a collection of stores. In no sense are any parts of the shopping center dedicated to the public for general purposes or the occupants of the Plaza exercising official powers. *The public is invited to the prem-*

*ises but only in order to do business with those who maintain establishments there. The invitation is to shop for the products which are sold.*

. . . .

I am fearful that the Court's decision today will be a license for pickets to leave the public streets and carry out their activities on private property, as long as they are not obstructive. *I do not agree that when the owner of private property invites the public to do business with him he impliedly dedicates his property for other uses as well. I do not think the [f]irst [a]mendment, which bars only official interferences with speech, has this reach.*

*Logan Valley,* 391 U.S. at 337–340, 88 S.Ct. 1601 (White, J., dissenting) (emphases added).

### 4. *Lloyd Corp. v. Tanner*

Four years later, in *Lloyd Corp. v. Tanner,* 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972), the United States Supreme Court reconsidered the doctrine set forth in *Logan Valley* and adopted, by a five-to-four majority, the logic of Justice White's dissent:

The basic issue in this case is whether respondents, in the exercise of asserted [f]irst [a]mendment rights, may distribute handbills on Lloyd's private property contrary to its wishes and contrary to a policy enforced against all handbilling. In addressing this issue, it must be remembered that *the [f]irst and [f]ourteenth [a]mendments safeguard the rights of free speech and assembly by limitations on state action, not on action by the owner of private property used nondiscriminatorily for private purposes only.*

. . . .

Respondents contend, however, that the property of a large shopping center is 'open to the public,' serves the same purposes as a 'business district' of a municipality, and therefore has been dedicated to certain types of public use. The argument is that such a center has sidewalks, streets, and parking areas which are functionally similar to facilities customarily provided by municipalities. It is then asserted that all members of the public, whether invited as

customers or not, have the same right of free speech as they would have on the similar public facilities in the streets of a city or town.

The argument reaches too far. The Constitution by no means requires such an attenuated doctrine of dedication of private property to public use. The closest decision in theory, *Marsh v. Alabama, supra,* involved the assumption by a private enterprise of all of the attributes of a state-created municipality and the exercise by that enterprise of semiofficial municipal functions as a delegate of the State. In effect, the owner of the company town was performing the full spectrum of municipal powers and stood in the shoes of the State. In the instant case[,][t]here is no comparable assumption or exercise of municipal functions or power.

*Nor does property lose its private character merely because the public is generally invited to use it for designated purposes.* Few would argue that a freestanding store, with abutting parking space for customers, assumes significant public attributes merely because the public is invited to shop there. Nor is size alone the controlling factor. *The essentially private character of a store and its privately owned abutting property does not change by virtue of being large or clustered with other stores in a modern shopping center.*

. . . .

We hold that there has been no such dedication of Lloyd's privately owned and operated shopping center to public use as to entitle respondents to exercise therein the asserted [f]irst [a]mendment rights.

*Lloyd,* 407 U.S. at 568–570, 92 S.Ct. 2219 (footnotes omitted) (emphases added).

### 5. *Hudgens v. NLRB*

A mere two years after *Lloyd,* the United States Supreme Court laid to rest any doubt that it had overruled the holding in *Logan Valley* when it stated that "we make clear now, if it was not clear before, that the rationale of *Logan Valley* did not survive the Court's decision in the *Lloyd* case." *Hudgens,* 424 U.S. at 518, 96 S.Ct. 1029. *Hudgens* ultimately held that warehouse employ-

ees of a company that operated a retail store in a shopping center had no first amendment right to enter the shopping center for the purpose of advertising their strike against their employer. "We conclude, in short, that under the present state of the law the constitutional guarantee of free expression has no part to play in a case such as this." *Id.* at 521, 96 S.Ct. 1029.

### 6. *Federal constitutional protections of free speech do not insulate Viglielmo from prosecution.*

■ The United States Supreme Court has established through the foregoing cases that property does not "lose its private character [for free speech purposes] merely because the public is generally invited to use it for designated purposes." *Lloyd,* 407 U.S. at 569, 92 S.Ct. 2219. Therefore, in light of the United States Supreme Court's decisions delineating the boundaries of first amendment protections in shopping centers, we hold that the district court did not err, on first amendment grounds, in denying Viglielmo's motions to dismiss or in finding her guilty, inasmuch as (1) the district court's decisions did not run afoul of federal constitutional case law and (2) Viglielmo's expressive conduct on the premises of Ala Moana Shopping Center was not protected under the first amendment to the United States Constitution.

### B. *The Free Speech Protections Found In Article I, Section 4 Of The Hawai'i Constitution Do Not Insulate Viglielmo From Prosecution For Criminal Trespass In The Second Degree.*

■ Although Viglielmo is unable to avail herself of the first amendment's protection of free speech within privately owned shopping centers, the United States Supreme Court has established that the states are free to interpret their own constitutional protections more broadly, as long as the restraints on private property "do not amount to a taking without just compensation or contravene any other federal constitutional provision." *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 81, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980).

### 1. *PruneYard Shopping Center v. Robins*

In *PruneYard,* the California Supreme Court construed its state constitution to protect free speech and petition rights, when reasonably exercised, in privately owned shopping centers, and the shopping center owner argued on appeal to the United States Supreme Court that recognition of such rights violated his "right to exclude others." 447 U.S. at 78, 100 S.Ct. 2035. The Court stated that its reasoning in *Lloyd* did "not *ex proprio vigore* limit the authority of the State to exercise its police power or its sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution." *Id.* at 81, 100 S.Ct. 2035. The United States Supreme Court ruled that the property owners were sufficiently protected by the ability to restrict expressive activity by "adopting time, place, and manner restrictions that will minimize any interference with its commercial functions." *Id.* at 83, 100 S.Ct. 2035. The United States Supreme Court concluded that neither the property owners' "federally recognized property rights nor their [f]irst [a]mendment rights have been infringed by the California Supreme Court's decision recognizing a right of appellees to exercise state-protected rights of expression and petition on appellants' property." *Id.* at 88, 100 S.Ct. 2035.

### 2. *State courts that more broadly interpret their constitutions to protect speech in shopping centers*

The few states that construe their constitutions to offer broader protection of speech in privately owned shopping centers than does the United States Supreme Court under the first amendment have done so under circumscribed conditions and usually under another provision unique to their constitutions. For example, the Washington Supreme Court has interpreted its state constitution to protect the right to gather initiative signatures at a privately owned shopping center because the speech and initiative provisions of the Washington Constitution do not require the same "state action" as the fourteenth amendment to the United States Constitution. *Alderwood Associates v. Washington Environ-*

*mental Council,* 96 Wash.2d 230, 635 P.2d 108, 117 (1981). Specifically, the seventh amendment to the Washington Constitution declares that "[t]he first power reserved by the people is the initiative[,]" and article 1, section 5 provides that "[e]very person may freely speak, write and publish on all subjects, being responsible for the abuse of that right." *Id.* at 114. The Colorado Supreme Court found that a mall could not exclude citizens engaged in nonviolent political speech because the mall functioned as a modern-day public forum and there was no showing that speech adversely affected the mall's business. *Bock v. Westminster Mall Co.,* 819 P.2d 55 (Colo.1991). The *Bock* court also found that the financial participation of the city in the development of the mall and the location of governmental agencies on the premises satisfied both the public function and state action requirements necessary to invoke state constitutional guarantees of free speech. *Id.* Massachusetts extends constitutional protections to the solicitation of signatures in shopping centers in order to be placed on the election ballot as a candidate for office because the state constitution expressly guarantees protection of free elections, unlike the federal constitution, and the initiative process in Massachusetts does not require state action. *Batchelder v. Allied Stores International, Inc.,* 388 Mass. 83, 445 N.E.2d 590 (1983). The right to solicit signatures in Massachusetts, however, is limited to "ballot access and not with any claim of right to exercise free speech rights apart from the question of ballot access." *Id.* at 595. New Jersey based its limited constitutional protection of "leafletting and associate speech in support of, or in opposition to causes, candidates and parties" in community shopping centers on a previous court ruling that the New Jersey Constitution conferred an affirmative right of free speech that was protected not only from governmental restraint, but from the restraint of private property owners as well. *New Jersey Coalition Against War in the Middle East v. J.M.B. Realty Corp.,* 138 N.J. 326, 650 A.2d 757, 781 (1994); *see State v. Schmid,* 84 N.J. 535, 423 A.2d 615 (1980).

### 3. *State courts that limit free speech rights in shopping centers*

The majority of state appellate courts that have considered whether their constitutions afford broader protection to speech in privately owned shopping centers than does the first amendment have concluded that they do not. Oregon recently narrowed its interpretation of state constitutional protections of speech and the initiative process; the Oregon Supreme Court held that the state constitutional right to initiate laws and constitutional amendments does not confer the right to solicit signatures for initiative petitions on private property over the owner's objections, abrogating prior state case law to the contrary. *Stranahan v. Fred Meyer, Inc.,* 331 Or. 38, 11 P.3d 228 (2000). The Connecticut Supreme Court declined to extend the state's constitutional free speech protections to a political advocacy group attempting to distribute literature and solicit signatures in a regional shopping mall. *Cologne v. Westfarms Assocs.,* 192 Conn. 48, 469 A.2d 1201, 1209 (1984). The court found no legal basis for distinguishing the shopping center "from other places where large numbers of people congregate, affording superior opportunities for political solicitation, such as sport stadiums, convention halls, theatres, country fairs, large office or apartment buildings[.]" *Id.* Michigan has interpreted its constitutional free speech, assembly, and initiative provisions to require state action to trigger their protective attributes and noted that television, newspapers, radios, and numerous other public forums provide alternative means of expression. *Woodland v. Michigan Citizens Lobby,* 423 Mich. 188, 378 N.W.2d 337, 357 (1985). The Washington Supreme Court clarified its holding in *Alderwood* when it held that a political organization had no right under the free speech provision of the state constitution to solicit contributions and sell literature at a privately owned shopping center because state action is required to trigger those protections. *Southcenter Joint Venture v. National Democratic Policy Committee,* 113 Wash.2d 413, 780 P.2d 1282, 1285 (1989). The court refused to "declare that its constitution grants an entirely new kind of free speech right-one that can be used not only as a shield by private individuals against

actions of the state but also as a sword against other private individuals." *Id.* at 1286. In the balancing of the competing interests of speech and property rights, the Wisconsin Supreme Court upheld a mall owner's prerogative to deny access to the shopping center for political speech, finding that a mall is not the functional equivalent of a municipality. *Jacobs v. Major*, 139 Wis.2d 492, 407 N.W.2d 832 (1987). The Illinois Supreme Court held that a private store's invocation of the criminal trespass to land statute, in order to exclude the circulator of a political nominating petition from its premises, was violative of neither the free speech nor the free elections provisions of the Illinois Constitution. *People v. DiGuida*, 152 Ill.2d 104, 178 Ill.Dec. 80, 604 N.E.2d 336 (1992).

Perhaps the decision most factually analogous to the record before us is *State v. Wicklund*, 589 N.W.2d 793 (Minn.1999), in which protestors stood in front of the Macy's retail store inside the Mall of America (MOA)—the largest shopping center in the United States, encompassing 4.2 million square feet and attracting 37.5 million visitors annually—and peacefully attempted to engage passers-by in a conversation about the ethics of producing and selling fur products. *Id.* at 795. MOA security guards warned protestors several times that they were on private property and that if they continued their activities, they would be arrested. *Id.* Four protestors remained and were arrested by police officers and charged with misdemeanor criminal trespass, in violation of Minnesota Statute § 609.605, sub. 1(b)(3) (1998), which provided that "[a] person is guilty of a misdemeanor if the person intentionally ... trespasses on the premises of another and, without claim of right, refuses to depart from the premises on demand of the lawful possessor[.]" *Id.* The Minnesota Supreme Court held that the defendants' protest was not constitutionally protected free speech under the first amendment, that there was no compelling reason to apply state constitutional free speech protections more broadly than federal protections, and that neither the invitation to the public to shop and be entertained at the mall nor public financing used to develop the property rose to the level of state action for purposes of state free speech protections. *Id.* at 803. The *Wicklund* court determined that the purpose of the protestors' speech was "not to achieve some political goal such as a ballot initiative," but was "best characterized as protest speech, intended to be provocative[,]" and declined to extend state constitutional free speech protections beyond those afforded by the first amendment. *Id.* at 801. *See also SHAD Alliance v. Smith Haven Mall*, 66 N.Y.2d 496, 498 N.Y.S.2d 99, 488 N.E.2d 1211 (1985); *State v. Felmet*, 302 N.C. 173, 273 S.E.2d 708 (1981); *Western Pa. Socialist Workers 1982 Campaign v. Connecticut Gen. Life Ins. Co.*, 512 Pa. 23, 515 A.2d 1331 (1986); *Eastwood Mall v. Slanco*, 68 Ohio St.3d 221, 626 N.E.2d 59 (1994); *Cahill v. Cobb Place Assocs.*, 271 Ga. 322, 519 S.E.2d 449 (1999).

4. *Application of article I, section 4 of the Hawai'i Constitution to the exercise of free speech in privately owned shopping centers*

■ The United States Constitution prohibits Congress from enacting laws "abridging the freedom of speech...." U.S. Const. amend. I. Article I, section 4 of the Hawai'i Constitution provides in relevant part that "[n]o law shall be enacted ... abridging the freedom of speech." "The rights specified in this section, virtually unchanged since statehood, are often referred to as 'first amendment rights' because they are identical to those found in the [f]irst [a]mendment to the [United States] Constitution." *In re John Doe*, 76 Hawai'i at 93 n. 16, 869 P.2d at 1312 n. 16 (quoting A.F. Lee, *The Hawaii Constitution* 37 (1993)) (brackets in original). "Professor Friesen has noted that '[s]tate free speech provisions are not generally violated by criminal statutes that, properly drawn, are aimed at the injurious effects of a threatening communication rather than the communication itself.'" *Id.* at 93–94 n. 16, 869 P.2d at 1312–13 n. 16 (quoting J. Friesen, *State Constitutional Law: Litigating Individual Rights, Claims and Defenses* § 5.04[3] at 5–20 to 5–20.1 (1993)).

■ We have long recognized, "beginning with *State v. Texeira*, 50 Haw. 138, 142 n. 2,

433 P.2d 593, 597 n. 2 (1967), that 'as the ultimate judicial tribunal with final, unreviewable authority to interpret and enforce the Hawai'i Constitution, we are free to give broader protection under the Hawai'i Constitution than that given by the federal constitution.'" *State v. Arceo,* 84 Hawai'i at 28, 928 P.2d at 870 (1996) (quoting *State v. Wallace,* 80 Hawai'i 382, 397 n. 14, 910 P.2d 695, 710 n. 14 (1996) (quoting *State v. Hoey,* 77 Hawai'i 17, 36, 881 P.2d 504, 523 (1994))). *See State v. Kam,* 69 Haw. 483, 491, 748 P.2d 372, 377 (1988) (Hawaii's constitution affords greater privacy rights than the federal right to privacy); *State v. Rogan,* 91 Hawai'i 405, 423, 984 P.2d 1231, 1249 (1999) (Hawaii's double jeopardy clause provides defendants broader protection than federal counterpart); *State v. Lessary,* 75 Haw. 446, 453, 865 P.2d 150, 154 (adopting the "same conduct" test and rejecting the federal standard based on the "same elements" test); *State v. Santiago,* 53 Haw. 254, 266, 492 P.2d 657, 664 (1971) (the protections enumerated by the United States Supreme Court in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), have an independent source in the Hawai'i Constitution's privilege against self-incrimination); *State v. Hoey,* 77 Hawai'i 17, 36, 881 P.2d 504, 523 (1994) (affording broader protection to suspects during custodial interrogation under Hawai'i Constitution than that recognized by *Davis v. United States,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)).

 We have also long recognized that "[t]he Hawai'i Constitution must be construed with due regard to the intent of the framers and the people adopting it[,]" *Kam,* 69 Haw. at 492, 748 P.2d at 377, and that "the fundamental principle in interpreting a constitutional provision is to give effect to that intent." *Id.*

 The initial inquiry, then, is whether, notwithstanding the identical language of article I, section 4 of the Hawai'i Constitution and the first amendment to the United States Constitution, the framers of the Hawai'i Constitution intended the protections afforded free speech therein to apply more broadly than their federal counterparts. Unfortunately, the proceedings of the 1950, 1968, and 1978 Hawai'i Constitutional Conventions shed no light on the framers' intent regarding the breadth of Hawaii's constitutional protection of free speech.

Inasmuch as there is no indication from the constitutional conventions to suggest that the Hawai'i constitutional protection of free speech was intended to be applied more broadly than its federal counterpart, we note that there is nothing intrinsic in the language of article I, section 4 that requires more extensive protection of free speech than the first amendment affords in the context of privately owned shopping centers. Thus, somewhat analogously, in *Estes v. Kapiolani Women's and Children's Medical Center,* 71 Haw. 190, 787 P.2d 216 (1990), we held that a hospital's no-solicitation policy precluding distribution of leaflets and other expressions of anti-abortion views did not implicate "state action" for the purposes of the state constitutional guarantee of free speech, and that an interior walkway adjacent to one of the main entrances of the hospital was not historically or traditionally associated with the exercise of free speech rights and therefore not to be treated as public property for free speech purposes. Hence, regarding article I, section 4 of the Hawai'i Constitution in a civil context, we have already endorsed the principle that state action is a prerequisite to a showing that the freedom of speech has constitutionally been abridged.

Viglielmo argues that we should adopt the reasoning of the United States Supreme Court in *Logan Valley, see supra* section III.A.3, as well as that of the few states that have interpreted their constitutions to offer broader protections for speech in shopping centers than does the United States Constitution, contending that shopping centers now perform the traditional function of what in bygone times was the town center, and that, therefore, free speech must be protected on shopping center grounds.[8] In essence, Vi-

---

8. Viglielmo also repeatedly cites *State v. Cargill,* 100 Or.App. 336, 786 P.2d 208 (1990), for support of a dismissal of the charge against her. In

*Cargill,* the Oregon Court of Appeals held that the Oregon constitutional right to initiative barred criminal prosecution for trespass of de-

glielmo advocates a standard that requires no state action abridging free speech and relies exclusively on the perceived equivalency of shopping centers and municipalities in seeking to subject private parties to the imperatives of the state constitutional guarantee of free speech. We cannot accept Viglielmo's position. *Logan Valley* was overruled by the United States Supreme Court's decision in *Lloyd.* As previously discussed, *see supra* section III.B.2, the minority of states that have allowed for broader state constitutional protection of free speech than that afforded by the first amendment, have generally done so under idiosyncratic constitutional provisions. Notwithstanding Ala Moana's size, number of visitors monthly, central bus transfer station, United States Post Office, and Honolulu satellite city hall, we cannot conclude on the record before us that Ala Moana is akin to a state actor.

### 5. *Viglielmo was not constitutionally immunized from the purview of HRS § 708-814(1)(b).*

Viglielmo urges that the evidence of Ala Moana's size, number of retail outlets, live entertainment performances, sidewalk sales, satellite city hall, and post office "compels the conclusion that this is a public area where [she] was protesting the sale of military toys to children." Viglielmo additionally argues that she believed she was a "business invitee" of Ala Moana, invited to "the premises of the shopping center to exercise her [f]irst [a]mendment rights of free speech and assembly." Viglielmo's proposition that property is, without more, somehow converted from private to public for free speech purposes because it is openly accessible to the public is simply wrong as a matter of law.

Pursuant to HRS § 708-814(1)(b), *see supra* note 2, "[a] person commits the offense of criminal trespass in the second degree if ... [t]he person enters or remains unlawfully in or upon *commercial premises* after rea-

sonable warning or request to leave by the owner or lessee of the commercial premises or the owner's or lessee's authorized agent or police officer[.]" (Emphasis added.)

We are unable to distinguish the present matter from *Wicklund, see supra* section III. B.3, and ultimately agree with the reasoning of the Minnesota Supreme Court. The facts of *Wicklund* and the present matter are virtually indistinguishable. Both involve prosecutions for criminal trespass and peaceful protests directed at a retail store, and both take place on the premises of two of the largest shopping centers in the United States. Indeed the Mall of America (MOA) is even larger and attracts more visitors than Ala Moana, also houses a post office, boasts over four hundred retail outlets, is home to numerous entertainment venues, and includes a wedding chapel, an alternative school, and a police substation. *Wicklund,* 589 N.W.2d at 795. It is noteworthy that, unlike the Hawai'i Constitution, the Minnesota Constitution provides that "all persons may freely speak ... on all subjects, being responsible for the abuse of such right[,]" thereby excising from its plain language any precondition that state action trigger Minnesota constitutional free speech protections. *Id.* at 799; Minn. Const. art. I, § 3. Nonetheless, the Minnesota Supreme Court concluded that "nothing inherent in the language of [a]rticle I, [s]ection 3 ... requires more expansive protection for free speech than does the [f]irst [a]mendment." *Id.*

Viglielmo has provided us with no compelling reason in her case to apply Hawaii's state constitutional protections more broadly than the protection afforded by the first amendment. Article I, section 4 of the Hawai'i Constitution, like the first amendment, mandates state action of some kind as a precondition to its application, and there has been simply no state action abridging Viglielmo's right of free speech in the present matter.

---

fendants who sought signatures for initiative petitions on a store's private property. Viglielmo fails to cite, however, subsequent Oregon case law limiting, and eventually overturning, *Cargill. See Fred Meyer, Inc. v. McDonald,* 112 Or.App. 321, 828 P.2d 1054 (1992) (holding that *Cargill* was limited by its facts to single store involved in

trespass prosecution); *Stranahan v. Fred Meyer, Inc.,* 11 P.3d at 244 (holding that state constitutional right to initiate laws and constitutional amendments does not confer right to solicit signatures for initiative petitions on private property over owner's objection).

Under these circumstances, we hold that article I, section 4 of the Hawai'i Constitution affords Viglielmo no greater free speech protection than the first amendment to the United States Constitution and that she is therefore not insulated from criminal liability under HRS § 708-814(1)(b), *see supra* note 2.[9]

## IV. *CONCLUSION*

In light of the foregoing analysis, we affirm the district court's judgment of conviction and sentence.

### Dissenting Opinion by ACOBA, J.

I believe that Article I, section 4 of the Hawai'i Constitution protects Defendant–Appellant Frances Viglielmo's expressional rights of leafleting and sign holding at community shopping centers like Ala Moana Shopping Center (Ala Moana Center). Therefore, I would reverse the October 9, 2003 judgment and sentence of the district court (the court).

### I.

The United States Supreme Court has interpreted the words "[n]o law shall be enacted . . . abridging the freedom of speech" contained in the federal constitution, U.S. Const. amend. I, as affording a person freedom of speech rights in a privately owned "company town" or "community business block," *Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), and in a privately owned shopping center,[1] *Amalgamated Food Employees Union, Local 590 v. Logan Valley Plaza, Inc.*, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968). The same words are mirrored in Article I, section 4 of the Hawai'i Constitution. In *Logan Valley*, the Court said that "under some circumstances property that is privately owned may, at least for First Amendment purposes, be treated as though it were publicly held." *Id.* at 316, 88 S.Ct. 1601. This is because, " '[o]wnership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it.' " *Id.* at 325, 88 S.Ct. 1601 (quoting *Marsh*, 326 U.S. at 506, 66 S.Ct. 276). The "similarities between the business block in *Marsh* and the shopping center in [*Logan Valley* ] . . . [render t]he shopping center . . . the functional equivalent of the business district" for First Amendment purposes. *Id.* at 317–18, 88 S.Ct. 1601. Consequently,

> because the shopping center serves as the community business block and is freely accessible and open to the people in the area and those passing through, the State may not delegate the power, through the use of its trespass laws, wholly to exclude those members of the public wishing to exercise their First Amendment rights on the premises in a manner and for a purpose generally consonant with the use to which the property is actually put.

*Id.* at 319–20, 88 S.Ct. 1601 (internal quotation marks and citation omitted). The Court held, then, that a shopping center that is "the functional equivalent of a 'business block' . . . must be treated in substantially the same manner[,]" and individuals wishing to exercise their right to free speech may not be

---

9. Inasmuch as Viglielmo's conduct was not protected by article I, section 4 of the Hawai'i Constitution, and thus her prosecution did not violate her constitutional right to free speech, Viglielmo's contention that her prosecution under HRS § 708-814(1)(b) violates article I, sections 2 and 5 is without merit and, thus, we do not address it further herein. In the present matter, without a violation of Viglielmo's right to free speech there can be no deprivation—by virtue of Ala Moana's enforcement of its no-protest policy or Viglielmo's prosecution under HRS § 708-814(1)(b)— of her "enjoyment of life, liberty and the pursuit of happiness," pursuant to article I, section 2 of the Hawai'i Constitution, or deprivation of "life, liberty or property without due process of law," pursuant to article I, section 5 of the Hawai'i Constitution.

1. *Amalgamated Food Employees Union, Local 590 v. Logan Valley Plaza, Inc.* described the "suburban shopping center" as "typically a cluster of individual retail units on a single large privately owned tract." 391 U.S. 308, 324, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968). A "mall" is defined as a "shopping mall." *Webster's Third Int'l Dictionary* 91a (1993). "Shopping Mall" is defined as "a large usu[ally] suburban building or group of buildings containing various shops with associated passageways[.] *Id.* at 109a.

excluded through the use of trespass laws. *Id.*

However, in a 5–4 split decision in *Lloyd Corp. v. Tanner*, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972), a majority of the Supreme Court receded from this position, indicating that distribution of handbills in a shopping center was not protected under the First Amendment because "there has been no such dedication of [petitioner's] privately owned and operated shopping center to public use as to entitle respondents to exercise therein the asserted First Amendment rights." *Id.* at 570, 92 S.Ct. 2219. *See id.* at 584, 92 S.Ct. 2219 (noting that although the decision in *Logan Valley* "is only four years old[,] ... the composition of this Court has radically changed in [those] four years") (Marshall, J. dissenting, joined by Douglas, J., Brennan, J ., and Stewart, J.).

## II.

While textual differences may be a factor in determining whether we follow federal court construction of the same or similar words found in our constitution, such differences are plainly not determinative. The Supreme Court has recognized that "[i]t is fundamental that state courts be left free and unfettered . by [the Court] in interpreting their state constitutions." *Bock v. Westminster Mall Co.,* 819 P.2d 55, 58 (Colo.1991) (quoting *Minnesota v. Nat'l Tea Co.,* 309 U.S. 551, 557, 60 S.Ct. 676, 84 L.Ed. 920 (1940)). Hence, despite Hawai'i "adopt[ing] language nearly identical to that of the First Amendment for the protection [of] free speech," *Estes v. Kapiolani Women's & Children's Med. Ctr.,* 71 Haw. 190, 197, 787 P.2d 216, 221 (1990), a state has a "sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution." *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 81, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980).

Thus, we need not adopt the federal courts' narrow application of language in the federal constitution that is the same or similar to that in the Hawai'i Constitution, but may afford persons in our state broader protections. *See e.g., State v. Custodio,* 62 Haw. 1, 4, 607 P.2d 1048, 1050 (1980) ("Our state constitution, Article I, section 7, contains a similar provision [to the Fourth Amendment of the United States Constitution] which has been interpreted in some instances to afford greater protection than the federal constitution."); *State v. Kaluna,* 55 Haw. 361, 369, 520 P.2d 51, 58 (1974) ("We have not hesitated in the past to extend the protections of the Hawaii Bill of Rights beyond those of textually parallel provisions in the Federal Bill of Rights when logic and a sound regard for the purposes of those protections have so warranted."); *State v. Santiago,* 53 Haw. 254, 265, 492 P.2d 657, 664 (1971) ("[T]his court is the final arbiter of the meaning of the provisions of the Hawaii Constitution. Nothing prevents our constitutional drafters from fashioning greater protections for criminal defendants than those given by the United States Constitution.").

Conversely, broader language in Hawaii's Constitution than that found in the U.S. Constitution has not necessarily resulted in an expansion of rights. *See State v. Okubo,* 67 Haw. 197, 682 P.2d 79 (1984) (holding that the express right of privacy in the Hawai'i constitution did not mandate that a warrant be obtained to record a conversation a defendant had with a party who had consented to such a recording). The neutral principle that should guide us is whether in a particular case, a "sound regard" "for the purpose" of the rights involved, warrants greater protection than that afforded under the federal constitution. *Kaluna,* 55 Haw. at 369, 520 P.2d at 58 (1974).

## III.

Preliminarily, it should be noted that *Estes* is not an obstacle to the application of free speech rights at a privately owned shopping center. Although it was said that "state action is a prerequisite to a showing that the freedom of speech has constitutionally been abridged," 71 Haw. at 192–93, 787 P.2d at 218–19, *Estes* expressly affirmed the protection afforded access to business districts and shopping centers that had been recognized in *Marsh* and *Logan Valley:* "Unlike sidewalks (*Marsh v. Alabama* ) or areas fronting retail stores (*Logan Valley, Hudgens [v. Nat'l Labor Relations Bd.,* 424 U.S. 507, 96 S.Ct.

1029, 47 L.Ed.2d 196 (1976) ] ), we hold that the interior walkway to the main entrance to the Hospital is not historically nor traditionally associated with the exercise of free speech." *Id.* at 196, 787 P.2d at 220 (emphases added). As indicated, *Estes'* holding was limited to a hospital walkway not traditionally open to free speech activity. Hence, the statement in *Estes* that, "[i]n construing Article I, Section 4 of our Hawai'i [C]onstitution we adopt the holdings of the federal cases construing the First Amendment[,]" is not a limitation on our power to construe the free speech provision in our constitution. *Id.* at 197, 787 P.2d at 221. Moreover, with respect to expressional activity at shopping centers, the Supreme Court has established that "a State in the exercise of its police power may adopt reasonable restrictions on private property so long as the restrictions do not amount to a taking without just compensation or contravene any other federal constitutional provision." *PruneYard*, 447 U.S. at 81, 100 S.Ct. 2035.

2. We have adopted the positions of dissenting justices in United States Supreme Court cases. *See e.g. State v. Cuntapay*, 104 Hawai'i 109, 116, 85 P.3d 634, 641 (2004) (adopting Justice Ginsburg's dissent in *Minnesota v. Carter*, 525 U.S. 83, 106, 109, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998), that short term guests have a protected right of privacy, inasmuch as " 'a guest should share his [or her] host's shelter against unreasonable searches and seizures' "); *State v. Kam*, 69 Haw. 483, 748 P.2d 372, 377 (1988) (adopting the dissenting view in *Pope v. Illinois*, 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987), that "since the 'government may not constitutionally criminalize [the] mere possession or sale of obscene literature, absent some connection to minors, or obtrusive display to unconsenting adults[,]' the government cannot prosecute the sellers of pornography"); *State v. Santiago*, 53 Haw. 254, 265–66, 492 P.2d 657, 664 (1971) (adopting the dissent's view in *Harris v. New York*, 401 U.S. 222, 229–32, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), that using tainted *Miranda* statements interferes with an accused's right to testify in his own behalf, for the Hawai'i Constitution's privilege against self-incrimination requires "that before reference ... at trial to statements made by the accused during custodial interrogation, the prosecutor must first demonstrate that certain safeguards were taken before the accused was questioned").

3. As mentioned, Justice Marshall, in his dissent in *Lloyd Corp.*, advocated "a balance between the freedom to speak, a freedom that is given a

## IV.

Justice Marshall, who authored *Logan*, stated in his dissent [2] in *Lloyd Corp. v. Tanner*, 407 U.S. 551, 580, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972) (5–4 decision) (Marshall, J. dissenting), that expressional freedom is a preferred value which may in some circumstances outweigh property rights:

> We must remember that it is a balance that we are striking—a balance between the freedom to speak, a freedom that is given a preferred place in our hierarchy of values, and the freedom of a private property owner to control his property. When the competing interests are fairly weighed, the balance can only be struck in favor of speech.

The view that, in balancing first amendment and private property rights, the state may place restrictions on the latter to preserve expressional conduct at shopping centers, has found acceptance even where free expression provisions in a state constitution differ from that of the federal constitution.[3]

preferred place in our hierarchy of values, and the freedom of a private property owner to control his property." 407 U.S. at 580, 92 S.Ct. 2219. Similarly, in *Pruneyard Revisited: Political Activity on Private Lands*, 66 N.Y.U.L.Rev. 633, 636 (1991), Professor Curtis J. Berger proposed that "[w]hile state constitutional theory may be an effective way to approach this issue ... state courts, in their common-law tradition, and state legislatures, in the exercise of their regulatory power, should determine that certain privately owned lands, such as shopping centers, must be open to various forms of political activity."

He argued that "state courts and legislatures may take this action without violating the owner's or the property occupant's federal constitutional rights[ ]" because "reasonable 'time, place, and manner' controls will suffice to enable the private owner to protect its legitimate economic and autonomy interests." *Id.* Berger maintained that "land ownership should not become the legal vehicle for closing off appropriate channels of political expression." *Id.* He asserted that "where the land's configuration and the activity it attracts begin to resemble those of a public forum, the owner's autonomy recedes in the face of a heightened need to find alternative channels for grassroots political activity." *Id.*

Thus, according to Berger, "[t]he nature of the private property at issue should be an essential part" in *balancing* "whether the rights of the specific property holder outweigh the interests of the party seeking entry." *Id.* at 666 (emphasis

The California Supreme Court has recognized that "central business districts apparently have continued to yield their functions more and more to suburban centers." *Robins v. Pruneyard Shopping Center*, 23 Cal.3d 899, 153 Cal.Rptr. 854, 592 P.2d 341, 345 (1979). In *Pruneyard*, the California Supreme Court apparently balanced the rights of the shopping center property owner with that of individuals seeking signatures for a petition. Thus, the California court affirmed that "[a] handful of additional orderly persons soliciting signatures and distributing handbills ... under reasonable regulations adopted by defendant to assure that these activities do not interfere with normal business operations would not markedly dilute defendant's property rights." *Pruneyard*, 23 Cal.3d 899, 153 Cal.Rptr. 854, 592 P.2d at 348; *see also PruneYard*, 447 U.S. at 81, 100 S.Ct. 2035 (holding that in the exercise of their police power states may adopt reasonable restrictions on private property).

New Jersey has adopted a balancing test for "determining the existence and extent of the State free speech right on privately-owned property."[4] As the New Jersey court explained, its test

> is to measure the strength of the plaintiff's claim of expressional freedom and the strength of the private property owners' claim of a right to exclude such expression—all for the ultimate purpose of "achiev[ing] the *optimal balance between the protections to be accorded private property* and those to be given to expressional freedoms exercised upon such property."

*New Jersey Coalition Against War in the Middle East v. J.M.B. Realty Corp.*, 138 N.J. 326, 650 A.2d 757, 772 (1994) (emphasis added). "Persons seeking expressive entry to a mall would have to convince a court to regard the property, despite its private ownership, as the equivalent of a public forum—a highly appropriate location for the activity in question." *Id.* at 666–67. Under this approach, the court may "conclude that 'under our State law the ownership of' this shopping mall 'does not include the right to bar access to' persons seeking to enter the mall for enumerated political activities and hence there was no trespass." *Id.* at 667.

ed) (quoting *State v. Schmid*, 84 N.J. 535, 423 A.2d 615, 629 (1980)).

The Supreme Judicial Court of Massachusetts employed a balancing test in determining that individuals could gather signatures at a private shopping center. The Massachusetts court stated that "[c]lose attention must be given to the property interests of a mall owner in determining whether an intrusion is reasonable in time, place, and manner," *Batchelder v. Allied Stores Int'l, Inc.*, 388 Mass. 83, 445 N.E.2d 590, 595 (1983).

In *Bock*, the Colorado Supreme Court utilized a balancing test in upholding the right of individuals to distribute political leaflets in the common area of a shopping mall. The Colorado court stated that "[c]onsidering all the facts and circumstances underlying the Mall's operation with the preferred liberty of speech in mind," free speech protections were triggered. *Bock*, 819 P.2d at 61.

In the exercise of such free speech rights at shopping centers, "those who wish to disseminate ideas [do not] have free rein[,]" but may be subject to time, place and manner rules as reasonably required. *Pruneyard*, 23 Cal.3d 899, 153 Cal.Rptr. 854, 592 P.2d at 347. *See Costco Co. v. Gallant*, 96 Cal. App.4th 740, 117 Cal.Rptr.2d 344, 351, 354 (2002) (holding that Costco's "time, place, and manner" restrictions were "narrowly tailored" to its "substantial interests in the smooth operation of its stores" and thus, valid); *see also, Slauson P'ship v. Ochoa*, 112 Cal.App.4th 1005, 5 Cal.Rptr.3d 668 (2003) (upholding stipulated injunction restricting behavior of protestors of strip club).

On the other hand, the approach adopted in *State v. Wicklund*, 589 N.W.2d 793 (Minn. 1999), is far from kindred to our situation. First, despite the broader language found in

4. To determine whether free speech rights may be exercised on private property, the New Jersey Supreme Court balances:
 (1) the nature, purposes, and primary use of such private property, generally, its "normal" use, (2) the extent and nature of the public's invitation to use that property, and (3) the purpose of the expressional activity undertaken upon such property in relation to both the private and public use of the property.
 *New Jersey Coalition Against War in the Middle East v. J.M.B. Realty Corp.*, 138 N.J. 326, 650 A.2d 757, 771–72 (1994).

the Minnesota Constitution,[5] the Minnesota Supreme Court adopted the construction given the narrower language of the federal constitution by the majority in *Lloyd Corp.* Second, unlike in our state,[6] the Minnesota Supreme Court has concluded that "[a] brief historical journey compels the conclusion that the inference cannot be drawn that our framers [of the Minnesota Constitution] intended a more expansive application." *Wicklund*, 589 N.W.2d at 799. Third, that court indicated a preference for giving its constitution the same construction as the U.S. Supreme Court accords similar provisions of the federal constitution on the ground that it is " 'a *significant undertaking* for any state court to hold that a state constitution offers broader protection than similar federal provisions....' " *Id.* at 799 (emphasis added) (quoting *Women of the State of Minn. by Doe v. Gomez*, 542 N.W.2d 17, 30 (Minn.1995)). Our jurisprudence rests not on any such precommitment but on whether "logic and a sound regard for the purposes of those protections" involved warrant extending such protections in any specific case. *Kaluna*, 55 Haw. at 369, 520 P.2d at 58.

## V.

This case is governed by the central principles established in *Marsh*, *Logan Valley*, and the state decisions recounted above. In *Marsh* and *Logan Valley*, the U.S. Supreme Court construed the same words found in Article I, section 4 of our constitution. In that context, it first is apparent that Ala Moana Center is the functional equivalent of a "business district of a city." *Lloyd Corp.*, 407 U.S. at 581, 92 S.Ct. 2219. Ala Moana Center is located in the Honolulu urban center, approximately 1.5 miles from the downtown financial district and 1.25 miles from Waikiki. It occupies fifty acres, with 1.6 million square feet of gross leasable area, more than 200 stores, and 8,500 parking spaces. It "is one of the largest open-air

shopping centers in the United States," and is designated a super regional shopping center visited by "over two million people ... each month." It "employs over 8,000 people, making it a major employment center[,]" "is Honolulu's central bus transfer station[,]" and among its amenities "contains the largest international food court in Hawaii and one of the largest in the United States," and hosts "over 550 performances per year on [its] 'Centerstage'[.]"

We may judicially notice that Ala Moana Center is more than a site where people shop, but is a gathering place where people engage in personal and social activities. It houses a United States Post Office and a Satellite City Hall. It is the site of various and numerous activities, among which are (1) Aloha Festival events, (2) voter registration, (3) blood bank drives, and (4) tai chi classes. Thus, it may be said of the Ala Moana Center, that

> [a]lthough the ultimate purpose of these shopping centers is commercial, their normal use is all-embracing, almost without limit, projecting a community image, serving as their own communities, encompassing practically all aspects of a downtown business district including expressive uses and community events.... [N]o *private property ... more closely resembles public property.*

*New Jersey Coalition*, 650 A.2d at 761 (emphasis added). Ala Moana Center projects an all-embracing community image. It is thus imbued with the characteristics of a public place where the community congregates at the invitation of its occupants.

Second, Viglielmo's activities did not interfere with normal business operations at the Center. Viglielmo was protesting the sale of military toys to children, encouraging passers-by to refrain from patronizing Kay–Bee Toy Store until the store stopped such sales. She was holding a sign and handing out

---

**5.** "The Minnesota Constitution provides that 'all persons may freely speak on all subjects, being responsible for the abuse of such right.' " *Wicklund*, 589 N.W.2d at 799 (quoting Minn. Const. art. I, § 3).

**6.** The majority points out that "the proceedings of the 1950, 1968, and 1978 Hawai'i Constitutional Conventions shed no light on the framers' intent regarding the breadth of Hawaii's constitutional protection of free speech." Majority opinion at 211, 95 P.3d at 966.

pamphlets. The security officer who cited Viglielmo stated that "she was not yelling or [causing] any type of public disturbance," nor was she physically preventing customers from entering the store.[7]

## VI.

A sound regard for the purposes of expressional activity warrants the extension of protection under Article I, section 4 of our constitution to the exercise of free speech rights at shopping centers that was once secured by the federal constitution.

Justice Marshall foreordained that, "[a]s governments rely on private enterprise, public property decreases in favor of privately owned property." *Lloyd Corp.*, 407 U.S. at 585, 92 S.Ct. 2219. "[T]he city reaps the advantages of" an "increased tax base, a drawing attraction for residents, and a stimulus to further growth[,]" by "having such [private shopping areas] without paying for them[.]" *Id.* With the expansion of private shopping centers, "[i]t becomes harder and harder for citizens to find [effective] means to communicate with other citizens." *Id.* at 586, 92 S.Ct. 2219.

Justice Marshall's statement rings true today. Predictably, shopping centers have increased in number and size. In their evolution, shopping centers have consciously expanded their role far beyond that of simply doing business. Public activities are solicited and invited into shopping malls. The role of traditional "downtown" forums where the public was reached on the streets and sidewalks, and in parks, and squares has been prominently replaced. Community shopping centers have become the new gathering place for the public. In the real world barring free speech activities at shopping centers will concomitantly diminish the exercise of expressional rights.

For many people "who do not have easy access to television, radio, the major newspapers, and the other forms of mass media, the only way they can express themselves to a broad range of citizens on issues of general public concern is to picket, or to handbill, or to utilize other free or relatively inexpensive means of communication." *Id.* at 580–81, 92 S.Ct. 2219. Justice Marshall warned that "[o]nly the wealthy may find effective communication possible unless we ... continue to hold that '[t]he more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it.'" *Id.* at 586, 92 S.Ct. 2219 (quoting *Marsh*, 326 U.S. at 506, 66 S.Ct. 276). Thus, "[t]he only hope that these people have to be able to communicate effectively is to be permitted to speak in those areas in which most of their fellow citizens can be found. One such area is the business district of a city or town or its functional equivalent." *Id.* at 581, 92 S.Ct. 2219.

The community shopping malls like the Ala Moana Center strive to "completely satisfy [the community's] wants[.]" *Id.* at 580, 92 S.Ct. 2219. Hence, community members "will have no reason to go elsewhere for goods or services. If speech is to reach these people, it must reach them in [the shopping center]." *Id.*

As public forums change in nature, form, and location, the preservation of expressional rights demands a reasoned and measured but resolute application of protections in areas which may afford the only "effective means of communication[ ]" for many. *Id.* at 586, 92 S.Ct. 2219. "One is not to have the exercise of his [or her] liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Logan Valley*, 391 U.S. at 323–24, 88 S.Ct. 1601 (quoting *Schneider v. State of New Jersey*, 308 U.S. 147, 163, 60 S.Ct. 146, 84 L.Ed. 155 (1939) (parentheses omitted). Therefore, I would hold that Article I, section 4 of the Hawai'i Constitution protects free speech rights such as leafleting and sign holding "reasonably exercised in [community] shopping centers even when [such] centers

---

**7.** Viglielmo was sixty-nine at the time of the incident. She is 5'6" tall and weighs 132 pounds.

are privately owned." *Pruneyard,* 23 Cal.3d 899, 153 Cal.Rptr. 854, 592 P.2d at 347.